PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

      *Plaintiff-Appellee,*

v.

WALTER RALEIGH JOHNSON, JR.,

      *Defendant-Appellant.*

No. 08-5098

Appeal from the United States District Court
for the District of South Carolina, at Anderson.
Henry F. Floyd, District Judge.
(8:07-cr-00960-HFF-2)

Argued: January 27, 2010

Decided: August 16, 2010

Before MICHAEL, MOTZ, and GREGORY, Circuit Judges.

Reversed and remanded by published opinion. Judge Gregory wrote the opinion, in which Judge Michael and Judge Motz joined.

## COUNSEL

**ARGUED**: Clarence Rauch Wise, Greenwood, South Carolina, for Appellant. Jeffrey Mikell Johnson, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee. **ON BRIEF:** W. Walter Wilkins, United States

Attorney, Columbia, South Carolina, Leesa Washington, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greenville, South Carolina, for Appellee.

## OPINION

GREGORY, Circuit Judge:

Walter Raleigh Johnson, Jr. ("Johnson") appeals his conviction for conspiracy to possess with the intent to distribute cocaine. He argues that the district court erred in admitting the testimony of a Drug Enforcement Administration ("DEA") Agent under Federal Rule of Evidence ("Rule") 701 and erred in admitting the testimony of a prior alleged drug customer under Rule 404(b). Because we find that the court erroneously admitted testimony under Rule 701 and Rule 404(b), and that the errors were not harmless, we reverse Johnson's conviction and remand his case for a new trial.

I.

The Sheriff's Department of Greenwood County, South Carolina began conducting the drug investigation at issue in January 2007. As part of that investigation, a drug informant collaborated with the Sheriff's Department and the Greenville, South Carolina DEA office to identify Mayo Pickens ("Pickens") as a source of cocaine in the area. After setting up phone calls and meetings and observing drug transactions between the informant and Pickens, the DEA obtained a court-approved wiretap for Pickens' cell phone. Although hundreds of calls were intercepted from Pickens' phone over the sixty-day period of the wiretap, only about 109 of those calls were relevant to the drug investigation. Out of the 109 relevant calls, only eight were intercepted between Pickens and Johnson, all occurring between June 10, 2007 and July

12, 2007. Based on the eight phone conversations between Pickens and Johnson, the DEA concluded that Johnson was one of Pickens' suppliers of cocaine. Johnson was arrested in August 2007, indicted in October, and charged with one count of conspiracy to possess with the intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and 846. There were eleven co-defendants charged as part of the same conspiracy, including Pickens, Yusef Lateef Holloway ("Holloway") and Wayne Edward Hull ("Hull"). Johnson and two other defendants in this case were the only parties who chose to go to trial. Pickens, Holloway and Hull all pled guilty.

At trial, the government called four main witnesses in its case against Johnson.[1] DEA Agent Randy Smith ("Agent Smith") presented testimony on the wiretap investigation. Holloway testified that he purchased cocaine from Johnson for two years beginning in 2003. Hull, a drug customer of Holloway's, testified that Holloway got his drugs from Johnson. Finally, Khalil Timpson ("Timpson") testified that he purchased drugs from Johnson in 1998.

Agent Smith was permitted to interpret four of the eight phone calls recorded between Pickens and Johnson during his testimony. After eliciting Agent Smith's credentials, which included eighteen years experience as a DEA agent, the government played excerpts of the various phone calls for the jury, while referring them to a transcript of the calls.[2] The government's attorney would then refer Agent Smith to a particular phrase in the conversation and ask him to explain its meaning. For example: "Special Agent Smith, close to the beginning of the call there is a line or there's a phrase that's

---

[1]Although the government called several other witnesses during their case in chief, the primary evidence against Johnson was elicited from these four witnesses.

[2]The transcripts were not admitted as evidence but merely used as an aid so the jury could follow along.

used by Mr. Johnson, 'I'm going to hit you and let you know what's happening.'" J.A. 91.[3] Before Agent Smith could offer his opinion, counsel for Johnson objected on the grounds that the question called for speculation. The district court asked the government's attorney to lay a foundation for testimony interpreting the calls. The government's attorney did so in the following manner:

> Q:   Special Agent Smith, how long have you been a DEA agent?
>
> A:   Since April of 1990.
>
> Q:   And how many—during the course of that time you have with DEA how many wiretaps have you participated in?
>
> A:   Approximately ten.
>
> Q:   And how many consensual calls have you monitored or participated in with informants?
>
> A:   Easily over a hundred.
>
> Q:   And how many cooperating defendants have you debriefed or interviewed?
>
> A:   Probably more than a hundred.
>
> Q:   Have you interviewed—how many defendants have you debriefed or interviewed who were actually involved in this case?
>
> A:   At least ten.

---

[3]Citations to J.A. __ refer to the Joint Appendix filed by the parties upon appeal.

Q: Have most of those interviews occurred before or after the initiation of the wiretap?

A: Most of them occurred after.

Q: Are you familiar with the street terms used—and I'm assuming they change from day-to-day, but are you familiar with the street terms typically used by those involved in the drug trade?

A: Yes I am.

. . . .

Q: All right. Based on your investigation thus far, prior to the wiretap and now after the wiretap, what did—do the terms—what did Mr. Johnson's part of the conversation midway down the page when they are talking about "hitting ya", what did that mean to you?

J.A. 91-93. Over the defense counsel's renewed objection, Agent Smith was permitted to answer: "He's referring [SIC] that when he is able to obtain cocaine, he'll let Mr. Pickens know so they can purchase it or so he can purchase it." J.A. 93. When asked how he knew that cocaine was the subject of the conversation, Agent Smith replied, "[j]ust based on other calls." *Id.* Agent Smith translated "[s]omebody hit me on anything I'll let you know what's happening," to mean "when he's [Johnson's] able to get cocaine and drugs, he will call Mr. Pickens and let him know." J.A. 95. Despite continually premising Agent Smith's testimony on his "training and experience," the government never proffered Agent Smith as an expert witness. Instead, the officer continued to offer his opinion regarding the nature of the phone calls between Pickens and Johnson. Although he maintained that the conversations referenced drug deals, Agent Smith admitted that "there was

no information that . . . Mr. Pickens and Mr. Johnson actually conducted a drug transaction" during the time period that the phone calls took place. J.A. 104. He further testified that he was not the officer who conducted the surveillance in the investigation and could not offer testimony regarding what the surveillance uncovered.

In addition to Agent Smith's testimony, the government called Holloway, a co-defendant with an extensive prior record who pled guilty to conspiracy in the case, to testify against Johnson. Holloway testified that he had known Johnson since 1998, and that he began to buy drugs from him in Anderson, South Carolina in the summer of 2003. Though he pooled the purchase money with Hull, another drug dealer in the area, Holloway testified that he went alone to transact deals because Johnson did not trust Hull. Holloway told the jury that over the next couple of years he purchased approximately forty to forty-five kilograms of cocaine from Johnson, half a kilogram to four kilograms per transaction. The drug deals occurred in Greenville, South Carolina or Atlanta, Georgia and the surrounding area. Holloway testified that the deals took place at a Wendy's parking lot on several occasions, as well as a Red Lobster parking lot and an apartment complex. During one deal in July 2005, Holloway and Johnson had a conversation on the quality of the cocaine being supplied and the price. Holloway alleged Johnson's drugs were bad because they did not yield as much product as expected and that the price per kilogram was too high, thereby harming his ability to make a profit on it. In December 2005, during the last deal that took place between the two, Holloway attempted to get his money back from Johnson for a bad batch of cocaine but was unable to do so. Holloway testified that he purchased drugs from a different supplier until his arrest in August 2006.

Hull, another co-defendant, testified that he was supplied drugs by Holloway and that Holloway's source was Johnson. Although Hull asserted he never went along for drug transac-

tions, he stated he had met Johnson in the course of dealing cocaine in Anderson, South Carolina, and even went to a strip club in Atlanta with Holloway and Johnson. Hull therefore pooled drug purchase money with Holloway to buy from Johnson but was not permitted to buy directly from him. Hull testified that despite complaints regarding the quality of cocaine Johnson supplied, Holloway continued to purchase drugs from Johnson because he was the cheapest supplier.[4]

DEA Agent Jarvis Reeder[5] ("Agent Reeder") testified to further inconsistencies in the testimony given by Holloway and Hull. Agent Reeder, who conducted a post-arrest interview with Hull, and wrote a report based on that interview, testified that Hull stated he taught Holloway how to cook cocaine into crack, whereas Holloway testified that Johnson taught him how to reduce cocaine to crack. Agent Reeder also testified that Hull stated in his interview that he and Holloway met Johnson in Atlanta, but never mentioned meeting him in Anderson, South Carolina, as Hull related in his testimony.

The final witness the government called against Johnson was Timpson. Prior to his testimony, defense counsel objected pursuant to Rule 404(b), arguing that Timpson's testimony was inadmissible character evidence. The district court overruled the objection and gave the jury an instruction on the limited purpose of the prior acts testimony. "For example, this evidence may be — may properly be considered to prove the defendant's motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident. In this instance the government seeks to offer the testimony to prove knowledge and intent." J.A. 263.

---

[4]This testimony directly contradicts Holloway's testimony that an unnamed drug trafficker called "White Boy" was his cheapest supplier. J.A. 213.

[5]Although initially called as a government witness, counsel for Johnson called Agent Reeder to testify regarding his interview with Hull and the inconsistencies between the information he collected in the interview and Hull's testimony at trial. J.A. 518–547.

Timpson is currently serving a prison sentence imposed in 2001 in North Carolina for possession of crack cocaine. He testified that in November of 1998 he purchased a kilogram of cocaine per week from Johnson. Their drug transactions followed a pattern. Timpson would deliver the purchase money to Johnson at his rim shop, East Cost Wheels, in Greenville, South Carolina. Johnson would then call Timpson and arrange for delivery of the cocaine at Bailey's Sports Bar in Greenville. This alleged pattern lasted for three to four months, until Johnson moved to Atlanta. Timpson was arrested in January 2000, and though he cooperated with the authorities at the time of his arrest, he did not tell the agents that Johnson had been his drug supplier, and instead gave the names of two other individuals. After Timpson's testimony, the district court ruled his testimony admissible under Rule 404(b).

Johnson called several witnesses to testify regarding his mode of employment. Mark Rice testified that Johnson was a broker for his rehab real estate business in Atlanta, and additionally sold household appliances in association with their business. Gerald Stitton testified that Johnson was a broker for his car dealership, and would bring him clients on a regular basis for a referral fee. Hansel Little testified that he had purchased real estate, a car, and several appliances from Johnson over the course of their friendship, and he had even employed Johnson in his personal training business for several months.

Johnson then took the stand in his own defense and asserted that not only had he never been involved with drugs before, but he had no prior record of criminal activity, and further had been employed as a United States Marine, a South Carolina State Trooper, and an entrepreneur with several business ventures in the real estate and auto industry. Johnson also called two close friends, Thorpe Jacob, his dentist, and Alan Forrest, a Georgia State Trooper, as well as his fiance, Christina Eschleman, a university administrator, and his mother, who

owned a funeral home in South Carolina, to testify regarding his lifestyle and character.

The jury convicted Johnson on the sole conspiracy count and he was sentenced to 220-months' imprisonment. This appeal followed.

## II.

On appeal, Johnson argues that the district court erred in admitting the testimony of Agent Smith and Timpson under Rule 701 and Rule 404(b) respectively. We address each argument in turn.

## A.

This Court reviews a district court's evidentiary ruling for abuse of discretion. *United States v. Perkins*, 470 F.3d 150, 155 (4th Cir. 2006) (citing *United States v. Gray*, 405 F.3d 227, 238 (4th Cir. 2005)). "A court has abused its discretion if its decision 'is guided by erroneous legal principles' or 'rests upon a clearly erroneous factual finding.'" *Brown v. Nucor Corp.*, 576 F.3d 149, 161 (4th Cir. 2009) (quoting *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999)).[6]

Evidentiary rulings are subject to harmless error review under Federal Rule of Criminal Procedure 52, such that "in order to find a district court's error harmless, we need only be able to say 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole,

---

[6]The government argues that plain error review applies to these issues because Johnson's counsel did not object with sufficient specificity under Rule 103(a)(1), where she only objected to the agent's testimony as "speculative" and not on the basis of Rule 701. Resp't. Br. 11, n. 9. Because there were many objections throughout Agent Smith's testimony which were sufficient to provide the district court with notice of the grounds for the objection, we decline to apply plain error review.

that the judgment was not substantially swayed by the error.'" *United States v. Brooks*, 111 F.3d 365, 371 (4th Cir. 1997) (quoting *United States v. Heater*, 63 F.3d 311, 325 (4th Cir. 1995)).

B.

Johnson argues on appeal that Agent Smith's testimony was erroneously admitted by the district court. Because Agent Smith was not proffered as an expert, Johnson argues that his testimony was only admissible as lay opinion testimony. Yet, Johnson asserts that because Agent Smith's opinions regarding the calls were not based on his own perception, but rather on his experience and training, his testimony cannot be considered a lay opinion for purposes of Rule 701. We agree.

Rule 701 permits lay opinion testimony where:

> if the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701. This Court explored the line between Rule 701 and 702 in *Perkins*. We held "lay opinion testimony *must* be based on personal knowledge." *Perkins*, 470 F.3d at 155-56. In order to adequately build a foundation for lay testimony, it must be "based on the perception of the witness." *TLT-Babcock Inc. v. Emerson Elec. Co.*, 33 F.3d 397, 400 (4th Cir. 1994) (citing Fed. R. Evid. 701). "A critical distinction between Rule 701 and Rule 702 testimony is that an expert witness 'must possess some specialized knowledge or skill or education that is not in possession of the jurors.'" *Certain Underwriters at Lloyd's, London v. Sinkovich*, 232 F.3d

200, 203 (4th Cir. 2000) (citation omitted). Therefore "[a]t bottom . . . Rule 701 forbids the admission of expert testimony dressed in lay witness clothing." *Perkins*, 470 F.3d at 156.

Here, we have exactly what Rule 701 forbids. The government called Agent Smith to testify regarding his interpretation of the wiretapped phone calls between Pickens and Johnson. In response to the defense's objection, the government elicited testimony on Smith's credentials and training, *not his observations* from the surveillance employed in this case. Furthermore, Agent Smith admitted that he did not participate in the surveillance during the investigation, but rather gleaned information from interviews with suspects and charged members of the conspiracy *after* listening to the phone calls. His post-hoc assessments cannot be credited as a substitute for the personal knowledge and perception required under Rule 701.

The government's reliance on *Perkins* to support its argument in this case is misplaced. In *Perkins*, we found no abuse of discretion where the district court admitted the testimony of police officers regarding whether a fellow officer's use of force was reasonable at a particular crime scene. Though the Court acknowledged that "the line between lay opinion testimony under Rule 701 and expert testimony under Rule 702 is a fine one," 470 F.3d at 155, the basic mandate that Rule 701 testimony be based on personal knowledge remained a guiding principle. In that instance, where the testifying officers were at the scene in question, their opinions were based on their "contemporaneous perceptions" and therefore satisfied the personal knowledge requirement of Rule 701. *Id.* at 156. By contrast, other officers who did not witness the officer's use of force could not provide lay testimony about whether or not it was reasonable, as they would be rendering expert opinion based on second-hand information. *Id.*

One of our sister circuits has considered this issue in an analogous case. In *United States v. Peoples*, 250 F.3d 630 (8th

Cir. 2001), the Eighth Circuit found that the officer in question was erroneously permitted to give her opinion regarding the meaning of plain English words and phrases when she gave "a narrative gloss that consisted almost entirely of her personal opinions of what the conversations meant." *Id.* at 640. Importantly, the Court found that the agent "lacked first-hand knowledge of the matters about which she testified. Her opinions were based on her investigation after the fact, not on her perception of the facts." *Id.* at 641.

Here, Agent Smith did not testify to directly observing the surveillance or even listening to all of the relevant calls in question. Instead, much of his testimony was what should have been considered that of an expert, as he consistently supported his interpretations of the phone calls by referencing his experience as a DEA agent, the post-wiretap interviews he conducted, and statements made to him by co-defendants. None of this second-hand information qualifies as the foundational personal perception needed under Rule 701. As such, the district court abused its discretion in admitting Agent Smith's testimony as a lay witness under Rule 701.

## C.

The government argues that even if the district court erred in admitting Agent Smith's testimony under Rule 701, that error is harmless because (1) the testimony could have been admitted under Rule 702, and (2) there was sufficient evidence of Johnson's guilt independent of the Agent's testimony. We disagree.

### 1.

Rule 702 permits expert testimony where it "will assist the trier of fact to understand the evidence or to determine the fact in issue." Fed. R. Evid. 702. Experts must have specialized knowledge that will assist the trier of fact, and the knowledge, skill, experience, training and education that qualifies

them on the subject of their testimony. *Id.* The testimony must be based on sufficient facts or data, and the witness must use reliable principles and methods, and apply those principles and methods reliably to the facts of the case. *Id.* It is well established that narcotics officers can be appropriately designated as experts on the drug market and drug jargon. *See United States v. Hopkins*, 310 F.3d 145, 150-51 (4th Cir. 2002) (affirming introduction of expert testimony about drug trade).

This Court outlined the appropriate manner by which narcotics officers should be qualified as experts in *United States v. Wilson*, 484 F.3d 267 (4th Cir. 2007). In that case, the defendant objected at trial to a detective being designated an expert witness where he failed to provide adequate support and methodology regarding his opinions on drug jargon and code. The Court found that the detective had adequately stated his methodology for deciphering the code used by the targets of the drug investigation. *Id.* at 277. In affirming the district court, we noted that the detective pointed to a pattern that emerged over time regarding certain words that were used out of the context of their dictionary meanings. *Id.* Although most of the detective's testimony was found to be properly admitted, we cautioned,

> [A]lthough the district court erred in failing to exclude Seabolt's testimony when that testimony either interpreted language that needed no interpretation, or when Seabolt did not adequately explain his methodology in reaching a questionable interpretation, the net effect was harmless because the overwhelming majority of Seabolt's expert testimony was properly admitted.

*Id.* at 278.

In the case at bar, it is clear that Agent Smith had sufficient expertise to qualify as a person knowledgeable in the field of

narcotics. On two occasions, he enumerated his experience both as a DEA agent and in conducting wiretap investigations. However, the Supreme Court has made clear that in addition to having the requisite specialized knowledge, the expert's testimony must "be the reliable product of reliable principles and methods that are reliably applied to the facts of the case." *Id.* at 274 (quoting Fed. R. Evid. 702 advisory committee's note); *see also*, *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141-42 (1999) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)). Although Agent Smith repeatedly indicated that he had the expertise to testify regarding drug jargon and the drug trade generally, he provided virtually no methodology or guiding principles that would enable him to decode the wiretapped phone calls in this case.

As such, we cannot say with any "fair assurance" that Agent Smith's testimony would have been admitted as expert testimony. *See Brooks*, 111 F.3d at 371. By the government's own admission, the phrases Smith interpreted "were not typical drug code" and "did not have common meaning in the drug world," Resp't Br. 21 n.15 (internal quotation marks omitted), which highlights the need for more information as to how Smith's experience in drug enforcement would qualify him as an expert in interpreting uncommon drug-related slang. In these circumstances, the government has failed to meet its burden of establishing that the district court would have admitted this somewhat unique testimony under Rule 702 based on Agent Smith's general drug-investigation experience alone. *See United States v. Curbelo*, 343 F.3d 273, 278 (4th Cir. 2003)("[F]or nonconstitutional errors, the Government must demonstrate that the error did not have a substantial and injurious effect or influence in determining the jury's verdict.") (internal quotation marks and citation omitted).

2.

Beyond arguing the district court's error was harmless under Rule 702, the government argues that there was suffi-

cient evidence, in addition to Agent Smith's testimony, which supported Johnson's conviction. However, because Agent Smith's testimony leant critical credibility bolstering the government's reliance on the testimony of three convicted drug dealers (who often contradicted themselves), we cannot agree, and find the district court's error was not harmless.

In order for an evidentiary ruling to be harmless, we must find that the judgment was not substantially swayed by the error. *See Brooks*, 111 F.3d at 371. Often in criminal cases where there is a significant amount of evidence which inculpates a defendant independent of the erroneous testimony, the error is considered harmless. *See United States v. Banks*, 482 F.3d 733, 741-42 (4th Cir. 2007). However, in this instance, the evidence against Johnson cannot be viewed independently from Agent Smith's testimony.

Both Holloway and Hull, co-defendants in this case, testified against Johnson. Each of them has a criminal history dating back over ten years, and each sought sentencing consideration for their cooperation in testifying. Though Holloway offered direct testimony regarding Johnson's alleged involvement in the conspiracy, his testimony was contradicted by Hull on several points. For example, Holloway testified that he always went alone to meet Johnson and that Johnson's prices were expensive. By contrast, Hull testified that he and Holloway took a trip to Atlanta with Johnson and that Holloway dealt with Johnson because he was the cheapest supplier. Hull also testified that he did not have direct knowledge of Johnson's alleged drug involvement because he never witnessed a transaction take place. Furthermore, Agent Reeder's testimony highlighted further inconsistencies, such as whether Hull or Johnson taught Holloway to cook crack, and whether or not Hull ever met Johnson in Anderson, South Carolina.

Timpson's testimony was also questionable. Although he claimed to have cooperated with the authorities regarding his drug involvement when he was sentenced in 2000, he did not

name Johnson as one of his suppliers. Instead, he named two other individuals, despite allegedly purchasing drugs from Johnson on a weekly basis for at least three months.

Furthermore, the government offered no direct evidence that linked Johnson to the charged conspiracy aside from the testimony of Holloway. No drugs were found, no financial evidence was presented and there was no surveillance that captured Johnson engaging in illicit activity, despite the extensive investigation mounted by the local DEA.

Thus, where three drug-dealer witnesses had considerable credibility issues in a case with little additional evidence, Agent Smith's testimony leant credence to their claims because his wiretap interpretations supported their testimony that Johnson was in fact involved in drug dealing. Had Agent Smith's testimony been excluded, the jury would have weighed the testimony of Johnson, a veteran and former law enforcement officer with no criminal record, against that of a convicted drug dealer and two co-defendants with long rap sheets. Where Agent Smith's testimony buttressed evidence against Johnson that was otherwise weak, "we cannot conclude that the evidence was unimportant or was not a substantial factor in the jury's verdict." *United States v. Grinage*, 390 F.3d 746, 751 (2nd Cir. 2004); *see also Peoples*, 250 F.3d at 642 (holding the Rule 701 error was not harmless where the jury may have found the testimony of a co-conspirator "inadequate to support a guilty verdict beyond a reasonable doubt had it not been buttressed by [the agent's] supporting information and opinions.").

We thus cannot find that admission of Agent Smith's testimony was harmless where it bolstered the scant, conflicting, and not entirely credible evidence against Johnson.

## III.

Johnson next argues that Timpson's testimony was not properly admitted under Rule 404(b) because it was not rele-

vant to nor necessary to prove Johnson's intent or knowledge in the case. He further argues that this error was not harmless due to the paucity of evidence before the court linking him to the conspiracy. We agree.

A.

Rule Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

Fed. R. Evid. 404(b). Our Circuit's jurisprudence concerning the application of Rule 404(b) has evolved by addressing the tension in cases involving evidence of prior drug transactions. *Compare United States v. Mark*, 943 F.2d 444, 448 (4th Cir. 1991) (holding evidence of prior drug-transaction testimony admissible under Rule 404(b) to prove knowledge and intent in drug conspiracy case) *with United States v. Hernandez*, 975 F.2d 1035, 1040 (4th Cir. 1992) (holding prior drug-transaction testimony inadmissible under Rule 404(b) in drug conspiracy case). As a result we endeavored to further clarify "the rule's [elusive] underlying principles" in *United States v. Queen*, 132 F.3d 991, 995 (4th Cir. 1997). We held that evidence of prior bad acts under Rule 404(b) is admissible when the following criteria are met:

> (1) The evidence must be relevant to an issue, such as an element of an offense, and must not be offered to establish the general character of the defendant. In this regard, the more similar the prior act is (in terms of physical similarity or mental state) to the act being proved, the more relevant it becomes. (2) The

act must be necessary in the sense that it is probative of an essential claim or an element of the offense. (3) The evidence must be reliable. And (4) the evidence's probative value must not be substantially outweighed by confusion or unfair prejudice in the sense that it tends to subordinate reason to emotion in the factfinding process.

*Queen*, 132 F.3d at 997.

Johnson argues that Timpson's testimony is not admissible under Rule 404(b) because the alleged prior drug transaction is not sufficiently related to the conspiracy charged such that it could be considered probative of intent or knowledge or necessary to prove those elements of the offense. The government counters that not only does Timpson's testimony satisfy the four criteria outlined in *Queen*, but the district court also provided a limiting instruction in this case, which provided "additional protection against the pitfalls" of admitting the character evidence that the rule seeks to exclude. *See Id.* The meager protection afforded by the court's limiting instruction, however, cannot outweigh the prejudice incurred by evidence that does not meet the mandate of the rule in the first instance.

In order for evidence of prior drug transactions to be admissible in a drug conspiracy case, the prior acts must be relevant to the charged offense. Thus, we have repeatedly found that the prior act which is alleged to be probative of an element of the crime must be "sufficiently related to the charged offense." *Mark*, 943 F.2d at 448 (internal quotation marks omitted) (quoting *United States v. Rawle*, 845 F.2d 1244, 1247 n.3 (4th Cir. 1988)); *Hernandez*, 975 F.2d at 1039. Therefore, the more closely the prior act is related to the charged conduct—either in time, pattern, or state of mind—the more probative it is of the defendant's intent or knowledge in relation to the charged conduct. *See Rawle*, 845 F.2d at 1247; *Mark*, 943 F.2d at 448; *Hernandez*, 975 F.2d at 1039. The fact that a defendant may have been involved in

drug activity in the past does not in and of itself provide a sufficient nexus to the charged conduct where the prior activity is not related in time, manner, place, or pattern of conduct.

In *Rawle*, we held that the prior bad act evidence was "properly introduced to show knowledge, common scheme or plan," where the defendant had transported marijuana on I-95 in empty tractor trailers in the past and was charged in a similar scheme. 845 F.2d at 1245-46. Because similar methods were used, such as placing paper products in the back of the trailer and creating false bills of lading to conceal the contraband, "there was sufficient similarity between these prior bad acts and the alleged acts of the defendant in the case at bar." *Id.* at 1248. In *Mark*, we found the character testimony was necessary to link the defendant to the co-defendants by showing he "was not an innocent friend of his codefendants but rather was a major cocaine distributor responsible for the transaction at issue." 943 F.2d at 448. The witness testifying against Mark corroborated another witness' testimony by detailing how the defendant was able to obtain the drugs which he later sold to his codefendants. *Id.* Mark's prior drug transactions occurred in the *same state* and during the *same year* he was arrested. *Id.* at 446. Because Mark testified on his own behalf regarding his innocuous relationship to the co-defendants, the "extrinsic act evidence . . . was *sufficiently related* to the charged offense and clearly relevant" to prove his intent and knowledge in the case. *Id.* at 448 (emphasis added).

In both *Rawle* and *Mark* the prior bad act evidence was related to the charged drug crimes in time and manner. By contrast, the testimony offered in *Hernandez* only bore a "slight relationship to the acts charged in the indictment," where the witness testified regarding the defendant's prior statements about a recipe for cooking drugs and then selling them in New York six months prior. 975 F.2d at 1038, 1040. Hernandez was charged with conspiracy to distribute drugs in the Washington, D.C. area and testified that she was in no

way involved in the conspiracy. The testimony in *Hernandez*, therefore, did not illustrate anything regarding the defendant's intent to sell drugs in Washington nor was it closely related in time or place to the charged offense. *Id.* at 1039 ("Evidence to show intent is not admissible when the unrelated bad act is tenuous and remote in time from the charges in the indictment.").

Just as the informant's testimony was "tenuous and remote" in *Hernandez*, so too was the evidence presented by Timpson's testimony. The drug transactions that Timpson alleged he conducted with Johnson occurred in 1998, *nearly five years before* the charged conspiracy allegedly began in this case. Not only was the testimony remote in time, but Timpson did not link Johnson to any of the other co-defendants. "In *Mark*, the trial court pointed out that the evidence of prior bad acts disclosed how the defendant got the drugs that he was charged with selling." *Hernandez*, 975 F.2d at 1040. No such nexus can be found in Timpson's testimony. Instead, Timpson merely described the transactions he alleged that he conducted with Johnson, which were neither directly nor indirectly related to the charged conspiracy. Even the description of the nature of the drug transaction—exchanging money at Johnson's rim shop before meeting at a bar to exchange the drugs—did not relate to the manner in which Holloway described transacting business with Johnson, such that this case could be said to fit within the circumstance described in *Rawle*. We therefore cannot find that Timpson's testimony was sufficiently related to the charged offense to render it adequately relevant to prove intent or knowledge. When, as here, the proponent of Rule 404(b) evidence cannot demonstrate that the evidence satisfies our four-part test for admissibility, we must notice error; in such circumstances, the Rule has been administered impermissibly "to convict a defendant on the basis of bad character, or to convict him for prior acts, or to try him by ambush." *Queen*, 132 F.3d at 997.

B.

Thus, we find that the district court erred in admitting Timpson's testimony under Rule 404(b), despite the district court's limiting instruction. Furthermore, we cannot say that this error was harmless, given the overall weakness of the government's case against Johnson, and the fact that Johnson testified in his own defense as well as called numerous witnesses to support his innocence.

As stated above, the government had scant evidence against Johnson in this case. Agent Smith translated four vaguely-worded phone calls which led to Johnson's arrest. Hull and Holloway told conflicting stories regarding the nature of their dealings with Johnson. Agent Reeder further illustrated the discrepancies between Hull and Holloway's accounts, discrediting the government's already weak case against Johnson. In addition, Johnson called seven witnesses to testify about his legitimate source of income, both in the form of employers and clients. Moreover, his fiance, a university administrator, and his mother, who ran a family funeral home in South Carolina, testified that Johnson was not and had never been involved in drugs. When viewed in light of the paucity of evidence the government presented, and the strength of the case Johnson presented, Timpson's testimony cannot be said to be harmless where it provided a powerful allegation linking Johnson to a totally unrelated drug-dealing conspiracy that took place several years before the investigation that led to Johnson's indictment.[7] In sum, the government

---

[7]It also cannot be said that the 404(b) error is harmless because Johnson "opened the door" to character evidence by taking the stand and disavowing any involvement in drug activity. Because Timpson was called in the government's case in chief, the error occurred prior to Johnson taking the stand, making it impossible to make a post-hoc assessment as to whether Johnson would have testified without the damaging, inculpatory testimony of Timpson. The record further supports this inference. See J.A. 578-607:

The government was allowed a stretch with Timpson, who's been incarcerated so long, with what he thought he knew from way

has failed to carry its burden of demonstrating — let alone advance any argument at all—that the Timpson testimony "did not have a substantial and injurious effect or influence on the result." *United States v. Lynn*, 592 F.3d 572, 585 (4th Cir. 2010) (internal quotation marks omitted). Consequently, we must reverse.

## IV.

For the foregoing reasons, Johnson's conviction is reversed and the case is remanded for proceedings consistent with this opinion.

*REVERSED AND REMANDED*

---

back in the day and we're not allowed the same latitude with respect to us being able to offer a credible defense for Mr. Johnson who's sitting back here fighting for his life.

J.A. 586 (Att'y. for Johnson).

. . .

Well, I think I need to testify to show my character.

J.A. 606 (Johnson Testimony).