**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 21-4297

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

SHANNON WHITE,

Defendant - Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Asheville.  Martin K. Reidinger, Chief District Judge.  (1:20-cr-00026-MR-WCM-1)

Submitted:  January 3, 2023                     Decided:  May 23, 2023

Before THACKER, RUSHING, and HEYTENS, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ON BRIEF:**  Anthony Martinez, Federal Public Defender, Ann L. Hester, Assistant Federal Public Defender, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for Appellant.  Dena J. King, United States Attorney, Charlotte, North Carolina, Amy E. Ray, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Appellant Shannon White appeals her conviction, following a jury trial, for distribution of fentanyl resulting in death, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). Specifically, Appellant challenges the district court's admission of lay opinion testimony as to the meaning of text messages, and the district court's admission of testimony that she lied in her post-arrest statement. For the reasons that follow, we affirm the conviction.

I.

Joshua Fronrath was found deceased in his parents' home of an apparent drug overdose on January 29, 2019. Officers at the scene contacted Detective Brian Leopard, who led the investigation. At trial, the Government presented evidence that Appellant had been texting with Fronrath about supplying him with drugs in the two days leading up to his death, January 27 and 28, 2019. The Government introduced the text message conversations into evidence and asked Detective Leopard to give his opinion on the meaning of them. Though the Government did not move to qualify Detective Leopard as an expert, it did elicit testimony about his extensive experience in drug investigations, his prior experience reviewing text message conversations in drug cases, and his experience in interpreting "drug slang" or "coded language."

Relevant here, Detective Leopard testified that "When you say are you good? They're not asking, you know, is your health okay. That's code. That's saying do you have

2

dope? Do you have drugs?" J.A. 609.[1]  He further testified that "blow" is a code word for heroin, J.A. 626, and that "biggie" is code for "your source of supply," J.A. 635–36.

Perhaps most important to the Government's case was Detective Leopard's testimony about his interpretation of the conversation between Fronrath and Appellant on January 28, 2019.  Detective Leopard testified that Fronrath asked Appellant if she had any drugs, to which she replied, "Yeah my biggie is no ain't gettn nothing frm Pam no more." J.A. 635.  Detective Leopard testified that based on that text message, "I believed that she has made contact with her source, and she's going to be able to get the heroin . . . [and] [t]hat she's not buying from Pam anymore." J.A. 636.  Fronrath asked Appellant "Who's that," and Appellant responded, "The one u always take me to meet." S.J.A. 142–43.[2] Detective Leopard testified that "[t]his message led me to believe that [Fronrath] picks up the defendant and will drive her to pick up their heroin, and that they have been – that [Fronrath] has taken her to this person before." J.A. 638–39.  Finally, Detective Leopard testified that when Fronrath told Appellant he was on his way back, "in the context of" his investigation, Detective Leopard took the text to mean "[t]hat she was up at [her biggie's], and she had purchased the heroin and was waiting for him to get there to pick her up to take her home." J.A. 641–42.  Appellant did not object to Detective Leopard's testimony as to the meaning of the text messages.

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

[2] "S.J.A." refers to the Supplemental Joint Appendix.

In addition to his testimony about the text messages, Detective Leopard testified that he had three separate interviews with Appellant during the course of his investigation—the February 2019 interview, an unrecorded interview in June 2019, and a post-arrest interview in February 2020.  Detective Leopard testified that in the first two interviews, Appellant admitted that she had sold Fronrath heroin on January 28 and that she had gotten drugs from her "biggie," Matthew Armanchain.  The jury watched the recording of the first interview during trial. But in the third interview, which took place after Appellant's arrest on February 21, 2020, Detective Leopard testified that Appellant told a new story, placing blame on Jessica McCoy, Virginia "Ginger" Backer, and Floyd "Bo" Woods.  The jury also watched the recording of that interview.

The story Appellant told Detective Leopard in her post-arrest interview was her defense theory at trial.  She claimed that although she sold Fronrath drugs on January 27, she was unable to obtain drugs for him on January 28.  Instead, she claimed that Fronrath had called Backer to find drugs for him, and she suggested that that McCoy and Woods were also involved.  Appellant's trial counsel spent much of her cross-examination of Detective Leopard attacking alleged deficiencies in his investigation of Appellant's alternative suspects.  On re-direct, the Government again asked Detective Leopard about his investigation following Appellant's post-arrest statement.  Detective Leopard explained that he had determined that McCoy could not have been involved on January 28 because she was in jail that day.  The Government then asked, "Did that fact impact your assessment at all of the credibility of this new story that the defendant was telling you?"  J.A. 771.  Detective Leopard responded that it did because "[w]e had already had the two prior

4

meetings where she had told me the same story over twice pretty much verbatim. Then after she's arrested she came up with a new story of someone that – who sold the drugs. . . ." J.A. 771. The Government concluded its re-direct examination by asking, without objection, "Is it your testimony today that you believe on February 20th -- February 21st 2020, in her post-arrest interview that the defendant was lying in order to protect herself?" J.A. 772–73. Detective Leopard responded, "Yes." J.A. 773.

In addition to Detective Leopard, the jury heard testimony from Fronrath's parents, other law enforcement officers, medical experts, a forensic toxicologist, and from McCoy and Woods. Both McCoy and Woods denied any involvement. McCoy testified that she was in jail on January 28 and had not taken any drugs to Fronrath. McCoy also testified that she had obtained heroin from Appellant on several occasions in 2019, and she recalled that Appellant made her use the drugs in front of her "because the police were trying to get her for the death of Josh Fronrath." J.A. 803–04. McCoy testified that Appellant told her "[Appellant] had sold [Fronrath] something, and he had done the shot at his house . . . and he had walked to his mom's and dad's and he went to his room and passed away." J.A. 804. For his part, Woods testified that he did not know Fronrath, had never delivered drugs to him, and had never even heard Fronrath's name until Detective Leopard interviewed him. Appellant did not testify at trial.

The jury also heard the thorough argument by Appellant's trial counsel as to the weakness in the Government's case and Detective Leopard's investigation. Specifically, Appellant's trial counsel pointed out that Detective Leopard had not interviewed Matthew Armanchain, and that the location data from Fronrath's cell phone did not support the

5

Government's theory that he had driven Appellant to Armanchain's on January 28. Appellant's trial counsel also pointed out that after Fronrath asked Appellant to hurry up, there were several calls between them and then Fronrath started calling a number associated with Backer. According to Appellant's trial counsel, Fronrath's cell phone records indicated that he could have been in the area of a hotel where Backer was staying, and there was evidence at trial that Backer was a known drug dealer. Finally, Appellant's trial counsel offered alternative interpretations to the January 28 text messages: "You see them show, yeah, my biggie is no ain't getting nothing from Pam no more . . . And I offer this: It looks like it means she's not getting anything . . . she's asking. Meaning she's got to go get drugs on the 28th." J.A. 960.

Ultimately, the jury rejected Appellant's theory and convicted her of distributing the fentanyl that caused Fronrath's death. On appeal, Appellant challenges Detective Leopard's lay opinion testimony as to the meaning of the text message conversations and his testimony that she was lying in her post-arrest interview.

## II.

Ordinarily, this court reviews a district court's admission of evidence for an abuse of discretion. *United States v. Simmons*, 11 F.4th 239, 261 (4th Cir. 2021). However, where a defendant fails to object at trial, we review only for plain error. *United States v. Garcia-Lagunas*, 835 F.3d 479, 492 (4th Cir. 2016). To prevail under the plain error standard, Appellant must "show there was an error, the error was plain, and the error affected [her] substantial rights." *Id.* (internal quotation marks omitted). An error is plain "when the settled law of the Supreme Court or this circuit establishes that an error has

6

occurred." *United States v. Ellis*, 326 F.3d 593, 596–97 (4th Cir. 2003) (internal quotation marks omitted). In most cases, for an error to have affected the defendant's substantial rights, "[i]t must have affected the outcome of the district court proceedings." *United States v. Olano*, 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). Even then, we will not correct the error unless "the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* at 736 (alteration and internal quotation marks omitted).

## III.

### A.

We first address Appellant's argument that the district court plainly erred in admitting Detective Leopard's testimony that he believed Appellant lied during her post-arrest interview. Appellant's argument is based on the rule that "[d]etermining the weight and credibility of witness testimony . . . has long been held to be the 'part of every case [that] belongs to the jury.'" *United States v. Scheffer*, 523 U.S. 303, 313, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998) (quoting *Aetna Life Ins. Co. v. Ward*, 140 U.S. 76, 88, 11 S.Ct. 720, 35 L.Ed. 371 (1891)). In this case Appellant did not testify and the jury was never asked to determine her credibility as a witness. Therefore, the cases cited by Appellant are inapplicable and do not establish plain error. Any alternative argument is waived.

### B.

Next, we address Appellant's argument that Detective Leopard's testimony interpreting the text message conversations was plain error.

Federal Rule of Evidence 701 permits lay-opinion testimony where the opinion is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge" that would qualify as expert testimony within the scope of Rule 702. *United States v. Arce*, 49 F.4th 382, 395 (4th Cir. 2022). The opinion must be based on personal knowledge. *Id.* (citation omitted).

In the context of lay opinion testimony as to the meaning of conversations, we have repeatedly held that the personal knowledge requirement is not satisfied by "'post-hoc assessments' about a conversation [one] had not participated in." *United States v. Min*, 704 F.3d 314, 325 (4th Cir. 2013); *see also United States v. Johnson*, 617 F.3d 286, 293 (4th Cir. 2010); *United States v. Hassan*, 742 F.3d 104, 136 (4th Cir. 2014) ("[W]e have ruled that testimony regarding a witness's understanding of what the defendant meant by certain statements is permissible lay testimony, so long as the witness's understanding is predicated on his knowledge and participation in the conversation."). Nor can an officer testifying as a lay witness interpret conversations by third parties by referencing his experience or investigation. *Johnson*, 617 F.3d at 293. "None of this second-hand information qualifies as the foundational personal perception needed under Rule 701." *Id.* While we have recognized that "the line between lay opinion testimony under Rule 701 and expert testimony under Rule 702 is a fine one," our case law draws that line clearly in this context. *Id.* (quoting *United States v. Perkins*, 470 F.3d 150, 155 (4th Cir. 2006)).

The Government argues that it was not error for Detective Leopard to interpret terms such as "good," "blow," and "biggie" because his testimony was based on his

8

personal observations as an investigator. According to the Government, Detective Leopard's testimony about the meaning of those terms was not based on after-the-fact investigation or general law-enforcement training. The Government's argument misconstrues and misapplies *Johnson*, which presented facts substantially similar to those here. In *Johnson*, the Government elicited lay opinion testimony interpreting wiretapped phone calls. 617 F.3d at 292–93. The officer testified to his "credentials and training, *not his observations* from the surveillance . . . Furthermore, [he] admitted that he did not participate in the surveillance during the investigation, but rather gleaned information from interviews with suspects . . . *after* listening to the calls." *Id.* at 293 (emphases in original). Given these facts, we held that the officer did not have personal knowledge and the district court had erred in admitting his testimony as a lay witness under Rule 701. *Id.*

Applying this standard, Detective Leopard's testimony was plainly inadmissible. Detective Leopard did not participate in the conversations. And, like the officer in *Johnson*, Detective Leopard testified that his interpretations, which go well beyond interpreting the three terms identified by the Government, were based on his career in law enforcement and his investigation in this case. Therefore, the district court's admission of Detective Leopard's testimony as a lay witness was plain error.

Even where there is plain error, Appellant must show that the error affected her substantial rights. "An error affects substantial rights when it is prejudicial, meaning the error 'affected the outcome of the district court proceedings.'" *United States v. Mills*, 850 F.3d 693, 700 (4th Cir. 2017) (quoting *Olano*, 507 U.S. at 734). Upon review of the record, we find that there was sufficient evidence of Appellant's guilt independent of Detective

9

Leopard's inadmissible testimony. The jury heard the recorded interviews with Detective Leopard where Appellant herself admitted that Fronrath asked her about getting drugs for him on January 27 and 28, and that he had taken her to Armanchain's to obtain drugs on January 28. While the Government did use Detective Leopard's testimony in conjunction with the text messages to lay out its theory of the case, the Government could have introduced the text messages and separately asked Detective Leopard about his investigation and Appellant's admissions, without asking him to interpret the text messages. Further, the jury heard all of Appellant's arguments about the holes in the investigation, but it rejected them.

IV.

Appellant has not shown that the district court erred in admitting Detective Leopard's testimony that he believed she lied during the investigation. And on this record, Appellant has not shown that the inadmissible portions of Detective Leopard's testimony affected the outcome of the trial. Therefore, we affirm the conviction.

We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*AFFIRMED*