# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

Jonathan Stanley Ostrowski, Appellant.

Appellate Case No. 2018-000423

———————

Appeal From York County
Brian M. Gibbons, Circuit Court Judge

———————

Opinion No. 5872
Heard November 2, 2020 – Filed November 24, 2021

———————

## AFFIRMED IN PART, REVERSED IN PART, AND REMANDED

———————

William G. Yarborough, III, and Lauren Carole Hobbis,
of William G. Yarborough III, Attorney at Law, LLC, of
Greenville, for Appellant.

Attorney General Alan McCrory Wilson and Assistant
Attorney General Jonathan Scott Matthews, both of
Columbia; and Solicitor Kevin Scott Brackett of York, all
for Respondent.

———————

**GEATHERS, J.:** Jonathan Ostrowski (Appellant) was convicted in 2018 of: (1)
trafficking methamphetamine, (2) possession of a weapon during the commission of
a violent crime, (3) possession of a handgun by a person convicted of a crime of

violence,[1] and (4) possession of a handgun with the serial number obliterated.  He challenges his convictions on seven grounds, ranging from a motion to suppress to improper jury instructions.  We reverse Appellant's convictions on methamphetamine trafficking and possession of a weapon during the commission of a violent crime;[2] affirm his convictions for possession of a handgun by a person convicted of a crime of violence and possession of a handgun with the serial number obliterated; and remand for a new trial on the reversed convictions.

## FACTS/PROCEDURAL HISTORY

On the morning of January 25, 2017, while officers with the York County Multijurisdictional Drug Enforcement Unit ("MDEU") and Drug Enforcement Agency-Columbia ("DEA") were surveilling 162 Bailey Avenue in Rock Hill, they saw Alexandria Peters[3] ("Peters") exit the home, where she sporadically stayed.  Peters, who was subject to an arrest warrant for prescription drug charges, drove to a nearby bank; law enforcement arrested her there.

Authorities then requested a search warrant for 162 Bailey Avenue.  Peters allegedly told officers that there was marijuana at the home.[4]  Additionally, in an affidavit in support of the request for a warrant, an officer assigned to the MDEU swore that "[o]fficers of the YCMDEU and the US Drug Enforcement Administration have been conducting an ongoing investigation of Jonathan Ostrowski in reference to narcotic violations."

---

[1] Ostrowski was convicted in 1995 of assault and battery of a high and aggravated nature.

[2] The conviction for possession of a weapon during the commission of a violent crime is dependent on Appellant's conviction for methamphetamine trafficking. *See* S.C. Code Ann. §§ 16-23-490 (defining possession of a weapon during the commission of a violent crime), 16-1-60 (defining "violent crimes"); *see also, e.g., Cook v. State*, 415 S.C. 551, 559 n.3, 784 S.E.2d 665, 669 n.3 (2015) ("Due to our reversal of Cook's voluntary manslaughter conviction, we also reverse his conviction for possession of a weapon during the commission of a violent crime, as the former conviction is a prerequisite for the latter.").

[3] Though both appellate briefs and the search warrant affidavit render Ms. Peters's first name as "Alexandria," she is consistently referenced elsewhere in the record as "Alexandra."  It is unclear which name is correct.

[4] At Ostrowski's trial, Peters denied that she said there was marijuana at the residence.

A law enforcement officer later conceded that when Peters was apprehended, the officers had—in the words of Ostrowski's counsel—"no evidence that there was any type of drug distribution from [Ostrowski's] residence." Bond Judge Tanesha Lonergan authorized the warrant. Officers searched the home and found a glass pipe, packaging materials, tin foil with methamphetamine, 20 dose units of Alprazolam, a .32 caliber gun and ammunition, at least one digital scale, sandwich bags, a glass pipe with marijuana, methamphetamine, and possibly an LG cell phone.[5] The methamphetamine was found "in the right front pants pocket from a pair of men's Columbia pants sized 38[,] which were on a shelf in a make shift closet/makeup room," according to a case summary by MDEU. "The room and shelves contained both male and female clothing."

At trial, one officer characterized the area as "in the middle of the house. Where the front door was they had kind of made an area for a closet and a dressing area." Ostrowski called it "an open area" accessible to the kitchen and living room.

Later that afternoon, the Chester County Sheriff's Office arrested Ostrowski in Great Falls. Law enforcement confiscated an LG cell phone from Ostrowski and obtained a warrant for the contents of the phone.

Ostrowski was indicted for trafficking more than 28 grams of methamphetamine, possession of a weapon during the commission of a violent crime, possession of a handgun by a person convicted of a crime of violence, and possession of a handgun with the serial number obliterated.

At trial, Ostrowski moved to suppress the evidence found at the Bailey Avenue residence, alleging in part that the search warrant was based on a misleading or false affidavit. The circuit court denied the motion.[6]

Later, the State attempted to have Investigator Hugh Leland Harrelson, a police officer then with the MDEU, "qualified as an expert in methamphetamine packaging, distribution, paraphernalia, and valuation." Investigator Harrelson was involved in the search of the Ostrowski residence following Peters's arrest. Ostrowski objected. The circuit court declined to qualify Investigator Harrelson; however, the circuit court ruled that Investigator Harrelson "can testify about what

---

[5] It is not entirely clear whether the LG cell phone listed on the inventory was the same one from which officers pulled the text messages at issue in this case; if so, the cell phone with those messages was taken from Ostrowski that afternoon.

[6] Ostrowski also moved to suppress based on the warrant being "overly broad." Ostrowski does not raise this ground on appeal.

he saw, he can testify about the way the house was; he can testify about what he found it in, he can testify about what a pipe looks like, he can testify about what a sandwich bag is and the significance of a sandwich bag." The circuit court stated that "if we attach . . . the label of an expert opinion on that it's, you know, I believe it[']s more. I agree with [defense counsel] that it is substantially more prejudicial than []probative[,] so therefore I'm not gonna allow that." The circuit court later indicated: "[]I've allowed under Rule 701 him to offer -- I wouldn't want to call it opinion testimony. I've allowed him as a lay witness and based upon, you know, what he does for a living to identify things to say what it is, what he knows them to be."

Much of Investigator Harrelson's subsequent testimony was given over objections from Ostrowski, including statements that a box of razor blades could be used "[t]o cut up drugs into smaller amounts" and that "sandwich baggies are commonly used to package drugs." Investigator Harrelson was also asked to "summarize the contents of the house and what it meant to you." He responded: "Clearly somebody who was using, and also selling methamphetamine, due to the methamphetamine pipes, and digital scales used to weigh out drugs, and also the sandwich baggies and tin foil used also to package drugs for sale to another individual."

The court later heard testimony from Investigator Michael Ryan King, also with the MDEU. Investigator King was never offered or qualified as an expert. Investigator King testified, frequently over objection, about the meaning of certain code words in the drug trade. For example, he testified that "clear" is a word for "methamphetamine." He also characterized some text messages sent or received by a phone linked to Ostrowski. For example, he testified about one message: "No green means no marijuana, just clear, which means I don't have any marijuana, all I have is meth."

During Investigator King's testimony, the State sought to admit several text messages to and from the phone seized from Ostrowski.[7] Ostrowski moved to exclude the text messages as evidence about other bad acts under Rule 404(b), SCRE. The State offered two reasons for allowing the text messages to come in. First, the State noted that the relevant Code section on trafficking allowed multiple avenues of proving trafficking in addition to the weight of the drugs, and the evidence would go to intent on the other methods of trafficking. Second, the State

---

[7] The vast majority of the text messages were from a period beginning three weeks before Ostrowski's arrest, but a handful were from early December.

said the evidence was relevant to prove "intent to control the disposition" of the methamphetamine as part of its case. In response, Ostrowski argued that the state's case was primarily based on possession of the statutorily sufficient amount of methamphetamine to trigger trafficking charges;[8] that evidence Ostrowski was dealing drugs might lead the jury to conclude that he owned the methamphetamine on improper grounds; and that "any []probative value that [the text messages] have . . . would be far substantially outweighed by the danger of unfair prejudice . . . ." The circuit court allowed the text messages into evidence, finding that they were "clear and convincing to me at least, as well as logically relevant to the issue at hand," and that the messages were "prejudicial to the defendant" but "substantially []probative to the State's case."[9] Those admitted included:

> [Ostrowski:] "Ok im in Richburg but I have them with me"
> [Ostrowski:] "And I have some clear if you want it"
>
> . . .
>
> [Ostrowski:] "Need to know what u want"
> [Other texter:] "Gram 1/4 smoke and any p.o. you got .what do I owe you 30"
> [Ostrowski:] "Yeah u owe me 30 so u want a g of clear 1/4 of smoke any pains"
> [Other texter:] "Yes Pp also"
> [Ostrowski]: "How many"
> [Other texter:] "10 give me a total on the money"
> [Ostrowski:] "I think I only have half quarter smoke so total will be 230"
> [Other texter:] "Ok I got it."
>
> ["MomaB":] "Hey u home"

---

[8] During its opening statement, the State alluded to other forms of trafficking but relied on the theory that Ostrowski was in constructive possession of more than 28 grams of methamphetamine. The State said: "Trafficking in South Carolina is the constructive possession of 28 grams or more of methamphetamine. That's it. That's what trafficking is."

[9] Ostrowski also argued that the text messages were not properly authenticated and were hearsay, grounds that he also raises to this court. We need not address these grounds because we conclude the text messages were inadmissible on other grounds. *See infra*.

[Ostrowski:] "No buti need myc**k sucked"
["MomaB":] "Well I need some dope on front
"MomaB"
[Ostrowski:] "U already owe me one"
["MomaB":] "Yeah but not cash
"MomaB"
[Ostrowski:] "I know"
["MomaB":] "I need some f**king dope I get u when I
[pick it] up"
[Ostrowski:] "I need my f**king c**k sucked"[10]

(All errors *sic*).

Ostrowski testified in his own defense and admitted to being a drug addict. He answered affirmatively when asked by the State whether his "drug of choice is methamphetamine." Ostrowski also testified that he sometimes had as many as a dozen people—some of them also drug addicts—stay at the residence. When asked by defense counsel whether he would "classify [his] house as a party house," Ostrowski answered affirmatively. Ostrowski also admitted to owning the pipes and other paraphernalia found in the home, but denied owning the bag of methamphetamine found in the residence or trafficking in drugs.

The State and Ostrowski had the following exchange about the clothing found in the dressing room area:

> Q. And I know that closet was in an open area. Those would be your clothes, right?
> A. Well, not necessarily.
> Q. Okay. How about men's pants in that armoire?
> A. There's men's pants, women's pants.
> Q. But your clothes would be in there, maybe other people's clothes, but your clothes would be in there because that is your house?
> A. Just because my clothes [are] in there don't mean my drugs are in there.

---

[10] The State initially appeared to ask for all of the messages to be published to the jury, then clarified that it was "not publishing all of these at this time, but they are all into evidence."

After the presentation of evidence and closing arguments, during the charge to the jury, the circuit court gave the following instructions:

> As you know the Defendant has pled not guilty to these charges and that plea has placed the burden upon the State to prove the Defendant guilty beyond a reasonable doubt. A person charged with committing a criminal offense is never required to prove innocence. I charge you, ladies and gentlemen, it is an important rule of law that the defendant in a criminal trial, no matter what the seriousness of the charge may be, will always be presumed to be not guilty of the crime for which the indictment was issued unless guilt has been proven by evidence satisfying you of that guilt beyond a reasonable doubt.
>
> . . . .
>
> This presumption of innocence is like a robe of righteousness. You see the robe I'm wearing, it's like a robe placed about the shoulders of the Defendant which remains with him until it's been stripped from him by evidence satisfying you of his guilt beyond a reasonable doubt.
>
> . . . .
>
> A reasonable doubt is a doubt which makes an honest sincere conscientious juror in search of the truth to hesitate to act. Proof beyond a reasonable doubt must therefore be proof of such a convincing character that a reasonable person would not hesitate to rely and act upon [it] in the most important of his or her own affairs.

After sending the jury out of the courtroom, the circuit court asked each party if it had any objections to the instructions as given. Ostrowski asked for a mistrial based on the circuit court's use of the phrase "in search of the truth." The court denied the request.

Ostrowski was convicted on all charges. The circuit court sentenced Ostrowski to five years on each of the weapons charges, to run concurrently, and 18 years on the drug trafficking charge. This appeal followed.

# ISSUES ON APPEAL

1. Did the circuit court err in denying the motion to suppress evidence found at the Bailey Avenue residence based on allegedly false and misleading information in the search warrant affidavit?

2. Did the circuit court err in allowing law enforcement officers to testify, without being qualified as experts, about (1) the potential use of items found at the Bailey Avenue residence; and (2) the meaning of the text messages found on Ostrowski's phone?

3. Did the circuit court err in not requiring the State to take additional steps to authenticate the text messages?

4. Did the circuit court err in admitting text messages into evidence because the messages were inadmissible hearsay?

5. Did the circuit court err in admitting the text messages into evidence because they constituted impermissible character evidence?

6. Did the circuit court fail to properly consider or explain its ruling on a challenge to the text messages based on an argument that the messages were more prejudicial than probative?

7. Did the circuit court impermissibly charge jurors to seek the truth when the court defined "reasonable doubt" as "a doubt which makes an honest sincere conscientious juror in search of the truth . . . hesitate to act"?

## STANDARD OF REVIEW

> On appeals from a motion to suppress based on Fourth Amendment grounds, [the appellate court] applies a deferential standard of review and will reverse if there is clear error. However, this deference does not bar [the appellate court] from conducting its own review of the record to determine whether the trial judge's decision is supported by the evidence.

*State v. Tindall*, 388 S.C. 518, 521, 698 S.E.2d 203, 205 (2010) (citation omitted).

On the other hand, "[t]he admission of evidence is within the discretion of the trial court and will not be reversed absent an abuse of discretion. An abuse of discretion occurs when the conclusions of the trial court either lack evidentiary

support or are controlled by an error of law." *State v. Pagan*, 369 S.C. 201, 208, 631 S.E.2d 262, 265 (2006) (citation omitted).

Finally, "[a] jury charge is correct if, when the charge is read as a whole, it contains the correct definition and adequately covers the law." *State v. Mattison*, 388 S.C. 469, 478, 697 S.E.2d 578, 583 (2010) (quoting *State v. Adkins*, 353 S.C. 312, 318, 577 S.E.2d 460, 464 (Ct. App. 2003)). "A jury charge that is substantially correct and covers the law does not require reversal." *Id.*

## LAW/ANALYSIS

We begin by taking up each of Appellant's contentions that the circuit court erred. After that, we consider whether any errors made by the circuit court were harmless.

## I.    Motion to Suppress

Appellant first contends that evidence from the search of the Bailey Avenue residence should have been excluded at trial because the warrant was based on a misleading affidavit, in violation of *Franks v. Delaware*, 438 U.S. 154 (1978). We disagree.

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

*Franks*, 438 U.S. at 155–56. The rule recognized in *Franks* does not merely bar affirmative false statements by law enforcement.

> [T]he *Franks* test also applies to acts of *omission* in which exculpatory material is left out of the affidavit. To be entitled to a *Franks* hearing for an alleged omission, the challenger must make a preliminary showing that the information in question was omitted with the intent to make, or in reckless disregard of whether it made, the affidavit misleading to the issuing judge. There will be no *Franks* violation if the affidavit, including the omitted

> data, still contains sufficient information to establish probable cause.

*State v. Missouri*, 337 S.C. 548, 554, 524 S.E.2d 394, 397 (1999) (citation omitted) (footnote omitted). However, "*Franks* clearly requires defendants to allege more than 'intentional' omission in [a] weak sense. . . . To obtain a *Franks* hearing[,] the defendant must show that the omission is the product of a 'deliberate falsehood or of reckless disregard for the truth.'" *U.S. v. Colkley*, 899 F.2d 297, 301 (4th Cir. 1990) (quoting *Franks*, 438 U.S. at 171).

Appellant claims that law enforcement officials omitted from the search warrant affidavit exculpatory information that would have served to undermine probable cause and otherwise mischaracterized evidence. For instance, Appellant notes that the warrants for Peters's arrest traced back to an incident in Fort Mill in September 2016. Additionally, Investigator Daniel Burkhart, whose affidavit supported the request for a search warrant, conceded that the MDEU did not have evidence that drugs were being distributed from Appellant's residence when the search warrant was issued. Appellant further argues that Investigator Burkhart's references in the affidavit to the investigation of the Bailey Avenue residence, and alleged implications of concrete evidence about the residence, were false or misleading.

At a pretrial hearing, Judge Lonergan testified that the investigation into drug activity was "absolutely" a factor in her decision to approve the warrant.[11] Appellant claims that Investigator Burkhart's failures to disclose that there was no concrete evidence of drug dealing from the residence and that the underlying offense for Peters's arrest was several months old and related to a different residence fatally undermine Judge Lonergan's finding of probable cause.

We find Appellant's claim falls short on all counts. Appellant cannot show that the information provided in the search warrant affidavit was false or misleading; that Investigator Burkhart or any other law enforcement official intentionally or recklessly made any false or misleading statements; or that the magistrate would

---

[11] There are limits on when a judge may "testify as a witness concerning actions taken in [her] official capacity." *See In re Whetstone*, 354 S.C. 213, 215–16, 580 S.E.2d 447, 448 (2003). However, it is not unheard of for magistrates to testify about the issuing of search warrants. *See, e.g., State v. Jones*, 342 S.C. 121, 126, 536 S.E.2d 675, 677 (2000); *State v. Martin*, 347 S.C. 522, 529, 556 S.E.2d 706, 710 (Ct. App. 2001).

have lacked probable cause if the purportedly false information was left out of, or the purportedly exculpatory information was placed in, the affidavit.

First, Appellant's efforts to turn minor disputes with the search warrant affidavit into false and misleading statements fail. Simply because there was no concrete evidence of drug distribution at the residence at the time the warrant was issued does not mean that there was no investigation of the residence underway. The warrant affidavit makes no explicit representation that Peters was distributing pills at the time she was arrested. Nor does it make any representation about where the incident at the root of Peters's arrest warrants took place.

Even conceding that the omission or inclusion of any of this information, or those omissions or inclusions put together, was false or misleading, Appellant has produced no evidence that Investigator Burkhart or any other law enforcement official acted recklessly or intentionally to falsify or conceal information appearing in the arrest warrant. Appellant simply puts forward the conclusory allegation that

> [a]lthough Investigator Burkhart testified he was not aware that the outstanding warrants stemmed from controlled buys between Peters and a CI had occurred [at] a different location . . . [,] he acted with a reckless disregard to the truth because the location of the controlled buys [was] listed on the outstanding arrest warrants and in the YCMDEU case file summary.

That information was hardly material to the search warrant, and even if it was, there is nothing in *Franks* or its progeny that suggests law enforcement officials must go rifling through every file connected to a case before requesting a warrant. *See Franks*, 438 U.S. at 171 ("Allegations of negligence or innocent mistake are insufficient."); *see also Colkley*, 899 F.2d at 300 ("An affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation."); *id.* at 301 ("*Franks* clearly requires defendants to allege more than 'intentional' omission in this weak sense.").

Finally, even if law enforcement officials had written the search warrant affidavit in precisely the fashion Appellant contends would have been accurate, there still would have been substantial reason for Judge Lonergan to find probable cause that evidence of illegal activity would be found at the residence. Investigator Burkhart's affidavit said that Peters had been properly Mirandized and had then "admitted there was some marijuana inside the residence." *See State v. Dupree*, 354 S.C. 676, 685, 583 S.E.2d 437, 442 (Ct. App. 2003) ("The magistrate's task in

determining whether to issue a search warrant is to make a practical, common sense decision concerning whether, under the totality of the circumstances set forth in the affidavit, including the veracity and basis of knowledge of persons supplying hearsay information, there is a *fair probability that contraband or evidence of a crime will be found in the particular place to be searched*." (emphasis added)). *See also State v. Keith*, 356 S.C. 219, 225, 588 S.E.2d 145, 148 (Ct. App. 2003) (finding probable cause to search a residence when an "affidavit outlined the investigative surveillance of [defendant]'s home, the officers' observation of [defendant]'s vehicle as it left the residence, the lawful stop, and discovery of marijuana.").[12]

In this case, officers were surveilling Appellant's residence in connection to an investigation for the distribution of drugs. The officers observed Peters leaving the residence; stopped her lawfully in regards to a valid warrant for her arrest; and discovered potentially illegal drugs on her person.[13] Once stopped, she reportedly told officers there was marijuana in the residence. The additional information that Appellant believes should have been in the warrant is of minimal consequence at best, and is extraneous and irrelevant at worst.

As a result, we find no violation of *Franks*.

## II. Testimony of Law Enforcement Officers

Appellant next contends that the circuit court erred by allowing Investigator Harrelson and Investigator King to provide opinion testimony during the trial, despite the fact that neither was qualified as an expert. The State counters that the opinion testimony was permissible, and alternatively, that any error was harmless.

At the outset, we note that law enforcement and other government officials are not permitted to offer opinions other than those that could otherwise be offered by lay witnesses. *See State v. Kelly*, 285 S.C. 373, 374–75, 329 S.E. 2d 442, 443 (1985) (finding a police officer "may only testify regarding his direct observations unless he is qualified as an expert."). *See also Fowler v. Nationwide Mut. Fire Ins. Co.*, 410 S.C. 403, 410, 764 S.E.2d 249, 252 (Ct. App. 2014) (volunteer fire

---

[12] We would note that, in contrast to Appellant's seeming notion that Peters's arrest must be tied specifically to evidence of trafficking at the Ostrowski residence, in *Keith*, the original offense for which the defendant's vehicle was seized was a tag violation. *See Keith*, 356 S.C. at 221, 588 S.E.2d at 146.

[13] Peters appeared to dispute the illegality of her possession of those drugs during her testimony at trial, saying officers "found my medication. To be clear on that, my own prescription."

department chief not qualified as an expert could not provide opinion testimony about how fire started).

However, in limited circumstances, law enforcement officers are allowed to draw on their experiences while testifying. The dividing line that many courts have drawn—and that our supreme court appears to have adopted—is that officers may provide lay opinions based on their observations, experience and training, but may not provide lay opinions on such matters if they did not either observe the events in question or actively participate in the investigation. *See Hamrick v. State*, 426 S.C. 638, 648–49, 828 S.E.2d 596 (2019); *United States v. Carrillo-Morones*, 564 F.Supp.2d 707, 710 (W.D. Tex. 2008) ("A law enforcement officer may render an opinion under Rule 701 where the opinion is based on the officer's personal knowledge of the events about which he or she is testifying.").[14]

For example, in *Hamrick*, our supreme court rejected the admission of lay opinion testimony from an officer who did not witness an accident but testified on a critical issue at trial based on his reconstruction of the accident. In that case, the officer in question "arrived on the scene forty-eight minutes after the incident occurred, and thus, he clearly *did not perceive the location of the impact*." *Hamrick*, 426 S.C. at 648, 828 S.E.2d at 601 (emphasis added). The court found error in the circuit court allowing the officer's testimony as lay opinion. *See id.* at 649, 828 S.E.2d at 601.

### A. Investigator Harrelson's Testimony

Appellant argues that, because the circuit court declined to qualify Investigator Harrelson as an expert witness, the circuit court erred when it allowed

---

[14] It is virtually impossible to entirely reconcile federal decisions on this rule. *See generally* Kim Channick, *You Must Be This Qualified to Offer an Opinion: Permitting Law Enforcement Officers to Testify as Laypersons Under Federal Rule of Evidence 701*, 81 FORDHAM L. REV. 3439, 3458 (2013) (observing that, among the federal circuit courts, some "allow a law enforcement officer to testify about the specifics of an investigation based solely on an after-the-fact review of the investigation materials"; others "have allowed law enforcement officers to testify about specific aspects of an investigation where the officer's after-the-fact knowledge of the event in question was combined with first-hand knowledge of related information"; and still others, including the Fourth Circuit, "have refused to admit law enforcement officers' lay opinion testimony where the testimony was not based on personal, first-hand knowledge of the specific event in question that extended beyond simply reviewing the investigation record").

Investigator Harrelson to testify about the significance of certain objects found during the search of Appellant's residence.  We disagree.

The State attempted to qualify Investigator Harrelson "as an expert in methamphetamine packaging, distribution, paraphernalia, and valuation."  The circuit court denied the expert qualification, but nonetheless ruled that Investigator Harrelson "can testify about what he saw, he can testify about the way the house was; he can testify about what he found it in, he can testify about what a pipe looks like, he can testify about what a sandwich bag is and the significance of a sandwich bag."  In ruling that Investigator Harrelson could testify to those things, though, the circuit court used language reminiscent of the standard for an expert opinion.  "He can testify all about that in his *experience and knowledge and skill as an officer*, an investigating officer with the DEU without attaching the label of an expert on that." (emphasis added).  *See* Rule 701, SCRE ("If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which . . . do not require *special knowledge, skill, experience*, or training." (emphasis added)).  However, it is evident that the court was allowing Investigator Harrelson to testify based on his personal knowledge of this case.

Our research reveals few state cases that are directly on point to the issues raised by Appellant.  However, federal courts have dealt with similar issues in drug cases.  This court has held before that "[f]ederal authority construing [an] identical element in Rule 701 of the Federal Rules of Evidence is instructive."  *State v. Fripp*, 396 S.C. 434, 439–40, 721 S.E.2d 465, 467 (Ct. App. 2012) (considering the "helpful to . . . the determination of a fact in issue" prong of Rule 701, SCRE).  *See also State v. Taylor*, 333 S.C. 159, 170–72, 508 S.E.2d 870, 875–76 (1998) (examining federal authorities when "Rule 106, SCRE, has not been interpreted by this [c]ourt," but was "substantially similar to Rule 106 of the Federal Rules of Evidence").

The South Carolina and federal rules on lay opinion testimony are identical in all meaningful respects.  *Compare* Rule 701, SCRE ("If the witness is not testifying as an expert, the witness'[s] testimony in the form of opinions or inferences is limited to those opinions or inferences which (a) are rationally based on the perception of the witness, (b) are helpful to a clear understanding of the witness'[s] testimony or the determination of a fact in issue, and (c) do not require special knowledge, skill, experience or training.") *with* Fed. R. Evid. 701 ("If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.").  *See also* D. Garrison Hill, *Lay Witness Opinions*, S.C. LAW., Sept. 2007, at 34, 36 ("The federal rule is

worded only slightly differently. . . .); *id.* at 39 ("The South Carolina version of Rule 701(c), as noted above, is phrased slightly differently but carries a virtually identical intent.").

Courts have frequently held that law enforcement officers can offer their opinion on certain aspects of the drug trade based on their *personal experience or knowledge* regarding the *particular investigation* at issue, or how those experiences and knowledge shaped their contemporaneous perceptions of what they saw *while acting in the course of an investigation. See, e.g., United States v. Perez*, 962 F.3d 420, 436 (9th Cir. 2020) (finding FBI agent could "match[] gang members to monikers and vice versa, translate[] gang jargon, and identif[y] indicia of drug trafficking, such as small plastic bags and digital scales" because he "directly observed the communications, meetings, and searches he described"); *id.* at 436–37 (finding FBI agent's "interpretation of the wiretapped conversation . . . is just the kind of 'ambiguous conversation[]' *a lay witness with direct knowledge of an investigation*—and, in this case, long hours spent listening to wiretaps and observing meetings—can clarify for the jury" (emphasis added)); *Colon-Diaz v. United States*, 899 F.Supp.2d 119, 137–38 (D.P.R. 2012) (permitting lay opinion testimony by law enforcement official and informant because "these witnesses were limited to testifying to opinions gleaned from factual information that *they personally perceived*" (emphasis added)); *United States v. Malagon*, 964 F.3d 657, 662 (7th Cir. 2020) (finding officer's "understanding of the meaning of the words used *in those conversations to which he was a party* fall within the proper scope of lay testimony, and there was no error in allowing the admission of the testimony" (emphasis added)); *United States v. Ayala-Pizarro*, 407 F.3d 25, 26, 29 (1st Cir. 2005) (ruling that an officer could "testif[y] about . . . how heroin is normally packaged for distribution at [drug distribution] points" without being qualified as an expert because the officer's perception that objects in the defendant's possession resembled heroin "decks" that the officer had encountered before was "testimony as to what he saw").

Here, Investigator Harrelson was discussing how the objects he found were sometimes used in drug trafficking based on what he had seen in previous investigations and how it informed his perception of what he saw while investigating Appellant. This testimony was permissible lay testimony, and there was no error in its admission.

### B. Investigator King's Testimony

Appellant additionally argues that Investigator King's testimony should not have been admitted as lay opinion. The State concedes that it did not attempt to

qualify Investigator King as an expert, "[p]erhaps in light of the trial judge's ruling on Investigator Harrelson." The State argues that Investigator King's knowledge of "drug slang terms" was (1) "acquired from his *experience* as a drug investigator," (emphasis added), and yet (2) "did not require special knowledge or training." We agree with Appellant.

Several federal courts have found that "drug jargon" testimony based on *general* terminology—i.e., not based on a witness's experience in a particular investigation—calls for expert testimony. *See, e.g., United States v. Haines*, 803 F.3d 713, 727 (5th Cir. 2015) ("We have 'recognized that in the context of drug conspiracies, "[d]rug traffickers' jargon is a specialized body of knowledge, familiar only to those wise in the ways of the drug trade, and therefore a fit subject for expert testimony." ' " (quoting *United States v. Akins*, 746 F.3d 590, 599 (5th Cir. 2014))); *United States v. Gadson*, 763 F.3d 1189, 1212 (9th Cir. 2014) ("*Unlike a lay witness*, a witness who is an expert on drug jargon may interpret encoded drug terms *even if the witness had not been involved in that particular investigation*." (emphases added)); *Carrillo-Morones*, 564 F.Supp.2d at 711 ("[A]ny testimony rendering an opinion formed as a result of facts and circumstances about which an officer lacks *personal knowledge* constitutes expert testimony under Rule 702." (citing *United States v. Peoples*, 250 F.3d 630, 642 (8th Cir. 2001))).

The Fourth Circuit found in *Johnson* that the admission of a Drug Enforcement Agent's testimony under circumstances similar to the current case was "exactly what Rule 701 forbids." *United States v. Johnson*, 617 F.3d 286, 293 (4th Cir. 2010). In that case, the agent listened to wiretaps that caught the defendant's communications and interviewed other "suspects and charged members of the conspiracy" in the investigation before his testimony, but after the communications. *Id.* The court ruled that because the agent "did not testify to directly observing the surveillance or even listening to all the relevant calls in question," the agent did not have the "the foundational personal perception needed under Rule 701" to give his opinion as a lay witness. *Id.*

Like the agent in *Johnson*, Investigator King was not closely involved in the investigation until after Ostrowski was arrested.[15] While he extracted text messages

---

[15] Investigator King testified that he "was not there at the time of the arrest and search warrant but [he] did download the cell phone." Later, the following exchange took place with Appellant's counsel:

from the cell phone after the fact, he was not personally involved in the surveillance and appears to have had no other role in the investigation of Ostrowski before then. Instead, he interpreted the messages based on his "general drug-investigation experience alone." *Id.* at 295.  This was textbook expert testimony and should not have been admitted unless the court first qualified Investigator King as an expert. *See id.* at 292–93.

## III.  Text Messages as Evidence of Other Bad Acts

Appellant next argues that the text messages were used by the State as improper character evidence to show Appellant was attempting to traffic the drugs in the current case because he had a general propensity to traffic drugs.  We agree.

"*State v. Lyle*[16] is the classic South Carolina case for understanding the admissibility of a defendant's other crimes [or bad acts]."  *State v. Perry*, 430 S.C. 24, 31, 842 S.E.2d 654, 658 (2020).  There, our supreme court laid out the factors to be considered when determining whether potentially inadmissible propensity evidence could instead be brought into court for other, permissible purposes.

> The acid test is its logical relevancy to the particular excepted purpose or purposes for which it is sought to be introduced. . . . [I]f the court does not clearly perceive the connection between the extraneous criminal transaction and the crime charged, that is, its logical relevancy, the accused should be given the benefit of the doubt, and the evidence should be rejected.

*Lyle*, 125 S.C. 406, 417, 118 S.E. 803, 807 (1923).  The court laid out five general exceptions to the rule against evidence of other bad acts.

> (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others; (5) the

---

> "Q. So, you were solely contained to just taking the information off a phone and that is it?
> "A. Correct."

[16] 125 S.C. 406, 118 S.E. 803 (1923).

> identity of the person charged with the commission of the crime on trial.

*Id.* at 416, 118 S.E. at 807 (quoting *People v. Molineux*, 61 N.E. 286, 294 (N.Y. 1901)).  Non-criminal bad acts that fall under one of the exceptions must be proven by clear and convincing evidence.  *See State v. King*, 424 S.C. 188, 200, 818 S.E.2d 204, 210 (2018) (citing *State v. Fletcher*, 379 S.C. 17, 23, 664 S.E.2d 480, 483 (2008)).  "Further, even though the evidence is clear and convincing and falls within a *Lyle* exception, it must be excluded if its probative value is substantially outweighed by the danger of unfair prejudice to the defendant."  *State v. King*, 334 S.C. 504, 512, 514 S.E.2d 578, 582 (1999) (italics added).

The State advances two primary reasons why the circuit court was right to admit the evidence of Appellant's previous alleged drug dealing in this case.  Each essentially turns on the issue of the ownership of the drugs.[17]  Still, we consider each of the State's arguments in turn.

### A. The Door-Opening Argument

First, the State argues that "Appellant invited a reply and opened the door for the State to admit his text messages based on his assertion in his opening statement that the methamphetamine belonged to another specific person."[18]  We disagree.

The State relies heavily on *State v. Dunlap*, 353 S.C. 539, 579 S.E.2d 318 (2003) to advance the proposition that "the State was entitled to introduce Appellant's text messages to prove he was not a mere addict but was actively engaged in the sale of methamphetamine."  The State's reading of *Dunlap* is too broad.  In *Dunlap*, the defendant was charged with distribution of crack cocaine based on the testimony of a witness who claimed to have bought the drugs at issue from the defendant.  *See State v. Dunlap*, 346 S.C. 312, 315, 550 S.E.2d 889, 891 (Ct. App. 2001), *aff'd as modified*, *Dunlap*, 353 S.C. 539, 579 S.E.2d 318 (2003).  Therefore, in *Dunlap*, the State was permitted to try to rebut the claim that the

---

[17] At trial, the State appears to have relied at least briefly on *res gestae* to support the admission of the text messages.  The State does not advance that argument on appeal.

[18] The State does not appear to have raised this issue before the circuit court.  However, "a respondent . . . may raise on appeal any additional reasons the appellate court should affirm the lower court's ruling regardless of whether those reasons have been presented to or ruled on by the lower court."  *I'On, L.L.C. v. Town of Mt. Pleasant*, 338 S.C. 406, 419, 526 S.E.2d 716, 723 (2000).

defendant did not try to sell drugs as a course of business, because the charge was based on Dunlap's alleged sale of drugs. *See Dunlap*, 346 S.C. at 541, 550 S.E.2d at 319.

Unlike the defendant in *Dunlap*, Appellant was not charged with trafficking *because of* a third party's testimony that Appellant had actively trafficked the drugs. Rather, Appellant was charged because he was allegedly in possession of a large enough quantity of the drugs to constitute trafficking. Therefore, whether Appellant was regularly involved in the sale or distribution of drugs was not crucial to the State's case as it was in *Dunlap*. Even if Appellant were just a user, if he had the requisite quantity of drugs, he could be found guilty of trafficking.[19]

For that reason, the defense's argument that Appellant was not actively involved in the distribution of methamphetamine did not by itself open the door for the State to introduce the contested evidence if it would otherwise be improper.

**B. Identity and Intent**

Next, the State argues that the evidence was admissible under the identity and intent exceptions to *Lyle*. We disagree on both counts.

The State asserts that the text messages prove the Appellant's identity as the owner of methamphetamine. However, nowhere does the State cite any specific facts or evidence offered at trial that illustrate how the text messages—even if they do prove a drug trafficking scheme—connect Appellant to the specific drugs at issue in this case. *See Lyle*, 125 S.C. at 417, 118 S.E. at 807 ("[I]f the court does not clearly perceive the connection between the extraneous criminal transaction and the crime charged, that is, its logical relevancy, *the accused should be given the benefit of the doubt*, and the evidence should be rejected." (emphasis added)). Indeed, an argument that Appellant owned these drugs because Appellant is a drug dealer is a definitional example of propensity evidence. The inference that the State clearly wanted jurors to draw was that because some of the text messages indicated Appellant was dealing drugs earlier—sometimes weeks before the incident at issue—then he must have owned the drugs found on January 25, 2017. *Cf. State v. Carter*, 323 S.C. 465, 468, 476 S.E.2d 916, 918 (Ct. App. 1996) ("[T]he purpose of the State's use of the evidence appears similar to that articulated by this [c]ourt in

---

[19] *Cf. State v. Wilson*, 345 S.C. 1, 7, 545 S.E.2d 827, 830 (2001) (allowing evidence of a previous drug sale in a possession with intent to distribute case when "the amount of crack seized was less than one gram and *the element of intent was not subject to the statutory prima facie showing*" (emphasis added)).

*Campbell* in that the State was not trying to prove a common scheme or plan[] but was instead trying to convince the jury that because [the defendant] sold crack cocaine . . . on January 14th, he was selling crack cocaine on January 18th. This is the precise type of inference prohibited by *Lyle*.").

The facts in this case are similar to those at issue in *Lyle*. In *Lyle*, the defendant was charged with a forgery that resembled similar crimes carried out in the same area on the same day, and those carried out in other, nearby cities on earlier dates. The court ruled that the crimes carried out on the same day could be admitted for identity purposes, reasoning that they were inconsistent with the defendant's alibi defense. However, the *Lyle* court did not allow the earlier crimes to be admitted under the identity exception because there was "no connection of time and place" between the alleged crime in Aiken and the earlier crimes in Georgia. Indeed, the court found this lack of time connection in an incident just 10 days earlier.

> [S]uch evidence strongly tends to induce the jury to believe that, merely because the defendant was guilty of the former crimes, he was also guilty of the latter; but *that is the precise inference the general rule was wisely designed to exclude*. . . . The mere fact that the Georgia crimes were similar in nature and parallel as to methods and technique employed in their execution does not serve to identify the defendant as the person who uttered the forged check in Aiken as charged, unless his guilt of the latter crime may be inferred from its similarity to the former. To warrant such inference[,] the similarity must have established such a connection between the crimes as would *logically exclude or tend to exclude the possibility that the Aiken crime could have been committed by another person*. There is nothing to indicate that the defendant held any monopoly of the methods and means used in passing the forged checks in Georgia, or that they were unique in the annals of crime.

*Lyle*, 125 S.C. at 420, 118 S.E. at 808 (emphases added) (citations omitted).[20]

---

[20] The *Lyle* court also noted that, on the issue of identity, its "conclusion is re–enforced by an additional consideration which we deem decisive"—namely, concerns about whether the proof of the defendant's participation in the other crimes was strong enough to be admitted. *Lyle*, 125 S.C. at 422–24, 118 S.E. at 809–10.

We decline to say precisely how far back in the history of the text messages the State could go, or even if text messages over a shorter period of time would be permissible in this case to prove the defendant was the owner of the methamphetamine. We concede that the closer the messages were to the date of the Appellant's arrest, the closer this case would become. However, we believe in this case that three weeks is too long, and six weeks is certainly too long for the handful of text messages that fall that far before Appellant's arrest.

On intent, the statute at issue in this case does not require Appellant to have any intent beyond knowing possession of the requisite amount of methamphetamine. *See* S.C. Code Ann. § 44-53-375(C) (2018) (making it a crime to traffic methamphetamine or "knowingly [be] in actual or constructive possession or . . . knowingly attempt[] to become in actual or constructive possession of ten grams or more of methamphetamine"). Showing that the defendant had intent to distribute the drugs is not listed in the statute as necessary for a conviction. Our supreme court has held that "[f]or constructive possession cases, the State must prove by other evidence the defendant had the right and power to exercise control over the drugs. Second, the State must prove the defendant had knowledge of the drugs and the intent to control the disposition or use of the drugs." *State v. Stewart*, 433 S.C. 382, 858 S.E.2d 808, 811 (2021), *reh'g denied* (June 16, 2021).

The statute also provides that anyone "who knowingly sells, manufactures, delivers, purchases, or brings into this State, or who provides financial assistance or otherwise aids, abets, attempts, or conspires to sell, manufacture, deliver, purchase, or bring into this State" methamphetamine is acting illegally. *Id.*

While the State cites several cases as supporting the circuit court's ruling in this case, none of them are precisely on point. For example, in *State v. Gore*, our supreme court found that evidence of prior drug sales was admissible to help prove intent. 299 S.C. 368, 369–70, 384 S.E.2d 750, 750–51 (1989). An informant testified about two instances on which the defendant, who was charged with possession with intent to distribute cocaine and conspiracy, had sold cocaine to the informant. The court reasoned that "evidence that appellant sold cocaine from the trailer on two occasions only one month earlier tends to establish his intent regarding the cocaine in his possession at the time in question." *Id.* at 370, 384 S.E.2d at 751.

However, while that might have tipped the balance for the *Lyle* court, its preceding discussion indicates that the earlier forgeries would have been inadmissible even if that evidence was more convincing.

The court added: "We conclude the probative value of this evidence outweighs its prejudicial effect and find no error in the trial judge's ruling." *Id.*

Likewise, in *State v. Wilson*, our supreme court ruled evidence of a prior drug transaction should have been allowed when the defendant was accused of trafficking while being in possession of less cocaine than needed to trigger the statutory presumption. 345 S.C. 1, 7–8, 545 S.E.2d 827, 830 (2001). In that case, the court noted "that the amount of crack seized [in the incident leading to charges] was less than one gram and the element of intent was not subject to the statutory prima facie showing," and so the State was required to prove intent through circumstantial evidence.[21] *Id.* at 7–8, 545 S.E.2d at 830 ("We have held that evidence of a prior drug transaction is relevant on the issue of intent when the defendant has been charged with possession of a controlled substance with intent to distribute. . . . Under *Gore*, this evidence is relevant on the issue of intent.").

However, unlike the defendant in *Gore*, Appellant in this case does not face a conspiracy charge in addition to the drug charge. While the supreme court did not dwell at length on its reasoning in *Gore*, the conspiracy charge inherently involved a question of intent—the intent to enter a criminal conspiracy to distribute drugs— that is not required in Appellant's case. *See generally State v. Crawford*, 362 S.C. 627, 636–646, 608 S.E.2d 886, 891–896 (2005) (outlining conspiracy law in South Carolina); *id.* at 637, 608 S.E.2d at 891 ("The gravamen of the offense of conspiracy is the agreement, or combination."). Additionally, unlike the State in *Wilson*, the State here only needed to show that Appellant knowingly possessed at least 28 grams of methamphetamine to meet its burden on intent.

The State could use any text messages that showed or tended to show that Appellant was in possession of the drugs that were at issue in the present case. None of the messages did so. They established Ostrowski dealt drugs, at times from his home. But they did not, for example, establish that he usually kept them in his pants.[22]

In *State v. Scott*, this court affirmed the admission of a drug defendant's concurrent possession of drug paraphernalia and marijuana seeds to show *knowing*

---

[21] Unlike *Wilson*, the supreme court's decision in *Gore* did not specifically mention whether the drugs seized in the search of the defendant's residence exceeded the level necessary for a prima facie distribution case.

[22] We do not intend to suggest that this is the only way that a text message might be relevant to the issue of intent. This is merely an illustration.

possession of other drugs in a trafficking case where ownership was disputed.[23]  303 S.C. 360, 363, 400 S.E.2d, 784, 786 (Ct. App. 1991).  In that case, the court considered only *relevance* and specifically found the defendant to have abandoned his argument that the evidence was unduly prejudicial.  *Id.* at 362 n.1, 400 S.E.2d at 785 n.1.

Even so, Appellant's case can be distinguished from *Scott*.  In *Scott*, drugs and paraphernalia found at the defendant's residence "tended to prove that Scott *knowingly possessed* the cocaine that the officers testified they found *in his hand*." *Id.* at 363, 400 S.E.2d at 786 (emphases added).  In other words, the fact that the defendant had drugs and paraphernalia at his residence at the same time that he was found with drugs on his person showed that he intended to possess *the drugs that were found on his person.  Id.*  In the present case, the drugs at issue were not found on Appellant's person, but at his home.[24]  The State was attempting to prove that, because Appellant had text messages indicating that he was dealing some methamphetamine at around the same time, he must have known of the drugs that were at his home and yet not specifically referenced in any of the text messages. This pattern of inferences could work only for the exact reason that such evidence is generally barred: because Appellant often owned drugs, he must have owned *these* drugs.  *Cf. Carter*, 323 S.C. at 468, 476 S.E.2d at 918 ("[T]he purpose of the State's use of the evidence appears similar to that articulated by this [c]ourt in *Campbell* in that the State was not trying to prove a common scheme or plan[] but was instead trying to convince the jury that because [the defendant] sold crack cocaine . . . on January 14th, he was selling crack cocaine on January 18th.  This is the precise type of inference prohibited by *Lyle*.")

Furthermore, the link here is far more attenuated than in *Scott*.  In *Scott*, the evidence supported an inference of the defendant's knowing possession because the drugs and paraphernalia were found at his home at the same time he was in possession of cocaine.  *Id.*  Here, the State sought admission of text messages not just from the day of Appellant's arrest, but from up to six weeks before Appellant's arrest.  Many of these messages are completely extraneous to the events that were the subject of the trial, and the State made no real effort to link the text messages to

---

[23] The court in *Scott* did not specifically rule on whether it considered the evidence in question evidence of identity or intent.  Because the question in *Scott* was related to the *mens rea* of the crime, we treat it as a decision on intent.

[24] There are indications in the record that Appellant had drugs on his person at the time of his arrest.  However, the circuit court excluded that evidence, and those drugs are not a part of the charges in this case.

the specific drugs at issue in this case. *See Lyle*, 125 S.C. at 417, 118 S.E. at 807. ("[I]f the court does not clearly perceive the connection between the extraneous criminal transaction and the crime charged, that is, its logical relevancy, the accused should be given the benefit of the doubt, and the evidence should be rejected.").

The text message evidence should not have been admitted at trial because it was not probative of Appellant's intent as to the offense with which he was charged in the present case. *See Lyle*, 125 S.C. at 420, 118 S.E. at 808 ("[S]uch evidence strongly tends to induce the jury to believe that, merely because the defendant was guilty of the former crimes, he was also guilty of the latter; but that is the precise inference the general rule was wisely designed to exclude."); *cf. State v. Perry*, 430 S.C. at 41, 842 S.E.2d at 663 ("When evidence of other crimes is admitted based solely on the similarity of a previous crime, the evidence serves only the purpose prohibited by Rule 404(b), and allows the jury to convict the defendant on the improper inference of propensity that because he did it before, he must have done it again." (decided under common scheme or plan exception)).

## C. Prejudicial vs. Probative Value

Appellant argues that even if the evidence could be used to prove intent, its admission was substantially more prejudicial than probative. We agree.

Because Appellant did not need to have a subjective intent to traffic the drugs in order to be convicted under the statute, the probative value of the text message evidence is relatively small on that aspect of intent. As previously discussed, the evidence is less direct than it was in *Scott*; furthermore, this court explicitly did not consider the question of whether the evidence was more prejudicial than probative in *Scott*. 303 S.C. at 362 n.1, 400 S.E.2d at 785 n.1. In any case, given that the statutory amount alone exposed Appellant to trafficking charges, the probative value of the text messages is more limited than it was in *Scott*.

Additionally, the amount of attention drawn to a prior bad act can play a role in determining whether the evidence is unduly prejudicial. *See State v. Johnson*, 293 S.C. 321, 326, 360 S.E.2d 317, 320 (1987) ("Considering the volume of testimony and evidence presented about the armed robbery, grand larceny and Swanson's murder, as well as the solicitor's numerous references to appellant's prior crimes in closing argument, it can be asserted with reasonable certitude that the prejudicial impact of the excessively detailed evidence presented concerning appellant's prior crimes outweighed its probative value.").

The State did not devote an overwhelming amount of time to the text messages relative to the whole of the trial.  However, the text messages or testimony about them comprised almost the entirety of Investigator King's testimony, and the State produced a sizable amount of such evidence.  By our count, the State admitted 113 text messages into evidence, covering a period from December 8, 2016, to January 25, 2017, during Appellant's trial.  Some of them included crude or threatening language that appears to have little or no connection to the drugs allegedly found at Appellant's home.  Nor did the State make much of an overt attempt to connect most of the messages to the drugs at issue in Appellant's indictments.

Further, the State said in its closing argument that the evidence on the phone was "the State's strongest evidence in this case and . . . will completely destroy the credibility of any defense argument because you take one look at that phone and you know the truth beyond a reasonable doubt."  Despite the limited probative value of the texts, the State counted on the jury to devote considerable attention to them.  Considering the state's focus on the text messages, the sheer number of text messages admitted, and the limited probative value of the evidence, the presentation of the text messages proved to be substantially more prejudicial than probative.  Allowing this was error.[25]

## V.    Jury Instructions

---

[25] The State argues that the text messages are somehow less prejudicial than drug convictions admitted into evidence in other cases.  The State does not explain this concept fully, but it is groundless and irrelevant.  Even if the text messages were for some reason less prejudicial, a point we are not willing to accept, the *weighing* of probative value against prejudicial effect is case-specific and not simply an issue of whether the evidence is more or less prejudicial than evidence admitted in prior cases. *See State v. Gillian*, 373 S.C. 601, 609, 646 S.E.2d 872, 876 (2007) ("The determination of the prejudicial effect of the evidence must be based on the entire record and the result will generally *turn on the facts of each case*." (emphasis added)); *State v. Lyles*, 379 S.C. 328, 338, 665 S.E.2d 201, 206 (Ct. App. 2008) ("When juxtaposing the prejudicial effect against the probative value, the determination must be based on the entire record and will *turn on the facts of each case*." (emphasis added)); *State v. Gray*, 408 S.C. 601, 610, 759 S.E.2d 160, 165 (Ct. App. 2014) ("The evaluation of probative value cannot be made in the abstract, but should be made in the *practical context of the issues at stake in the trial of each case*." (emphasis added)).

Finally, Appellant argues that the circuit court's instructions amounted to reversible error as a charge to the jury to seek the truth, at least partially shifting the burden of proof from the State to Appellant. We disagree.

"In reviewing jury charges for error, we must consider the court's jury charge as a whole in light of the evidence and issues presented at trial." *State v. Mattison*, 388 S.C. 469, 478, 697 S.E.2d 578, 583 (2010) (quoting *State v. Adkins*, 353 S.C. 312, 318, 577 S.E.2d 460, 463 (Ct. App. 2003)). "A jury charge is correct if, when the charge is read as a whole, it contains the correct definition and adequately covers the law." *Id.* (quoting *Adkins*, 353 S.C. at 318, 577 S.E.2d at 464). "A jury charge that is substantially correct and covers the law does not require reversal." *Id.*

Our supreme court has urged judges to avoid suggesting to jurors at any point during a trial that they should embark on a search for truth rather than basing their decision solely on the evidence and their inferences from that evidence.

> [A] trial judge should refrain from informing the jury, whether through comments or through a charge on the law, that its role is to search for the truth, or to find the true facts, or to render a just verdict. . . . We instruct trial judges to avoid these terms and any others that may divert the jury from its obligation in a criminal case to determine whether the State has proven the defendant's guilt beyond a reasonable doubt.

*State v. Beaty*, 423 S.C. 26, 34, 813 S.E.2d 502, 506 (2018) (footnote omitted). *See also State v. Aleksey*, 343 S.C. 20, 26–27, 538 S.E.2d 248, 251 (2000) ("Jury instructions on reasonable doubt which charge the jury to 'seek the truth' are disfavored because they '[run] the risk of unconstitutionally shifting the burden of proof to a defendant.'" (quoting *State v. Needs*, 333 S.C. 134, 155, 508 S.E.2d 857, 867–68 (1998))).

This court has previously interpreted *Beaty* as "echo[ing]" *Needs*. *See State v. Pradubsri*, 420 S.C. 629, 640–41, 803 S.E.2d 724, 729–30 (Ct. App. 2017).[26] In *Needs*, the supreme court "upheld the conviction because the circuit court reiterated

---

[26] Our court was referring to the supreme court's original decision in *Beaty*. The case was reheard in 2018, but its findings on the truth-seeking comments were substantively unchanged. *Compare State v. Beaty*, 423 S.C. at 32–34, 813 S.E.2d at 505–06, *with State v. Beaty*, Op. No. 27693 (S.C. Sup. Ct. filed Dec. 29, 2016) (Shearouse 2017 Adv. Sh. No. 1) at 13, 14–16.

the 'beyond a reasonable doubt' standard twenty-six times and the rest of the charge did not contain other disfavored language[.]" *Id.* (citing *Needs*, 333 S.C. at 154–55, 508 S.E.2d at 867–68). In *Pradubsri*, this court likewise upheld a verdict when the court repeated the standard "at least twenty times." *Id.*

There is no doubt that the circuit court in this case used a truth-seeking instruction. However, when viewed in their entirety, these instructions were "substantially correct" and unlikely to mislead the jury. The circuit court emphasized the importance to the jury of holding the state to its burden multiple times when charging them, and gave instructions that closely resembled those in cases where convictions were upheld despite similar phrases about "truth" being included in the jury instructions. *See, e.g., Pradubsri*, 420 S.C. at 640–41, 803 S.E.2d at 730 (affirming conviction when "the circuit court referenced the 'beyond a reasonable doubt' standard at least twenty times during its instructions" and used a "robe of righteousness" simile). Because of that, we find no reversible error in the jury charge.

## VI. Harmless Error

We have found error in two of the trial court's decisions: the admission of Investigator King's opinion testimony and the admission of the text messages. We will not reverse a verdict over harmless errors. *See State v. White*, 372 S.C. 364, 386, 642 S.E.2d 607, 618 (Ct. App. 2007) ("Generally, appellate courts will not set aside convictions due to insubstantial errors not affecting the result."), *aff'd in result*, 382 S.C. 265, 676 S.E.2d 684 (2009). However, because of the degree to which the phone evidence became a central aspect of the State's case against Ostrowski, we find that neither of the circuit court's erroneous rulings in this case were harmless.

> "[O]ur jurisprudence requires us not to question whether the State proved its case beyond a reasonable doubt, but whether *beyond a reasonable doubt the trial error did not contribute to the guilty verdict*." Put simply, the harmless error rule embodies a commonsense principle our appellate courts have long recognized—"*whatever doesn't make any difference, doesn't matter*."

> In determining whether error is harmless beyond a reasonable doubt, we often look to whether the "defendant's guilt has been conclusively proven . . . such that *no other rational conclusion can be reached*." Thus,

> "overwhelming evidence" of a defendant's guilt is *a relevant consideration* in the harmless error analysis.

*State v. Reyes*, 432 S.C. 394, 406, 853 S.E.2d 334, 340 (emphases added) (alterations in original) (citations omitted).

In the case before us, we cannot find that the errors were harmless. We struggle to say that beyond a reasonable doubt the erroneous evidence did not affect the verdict; that the impermissible evidence did not make any difference; or that a jury hearing the case could reach no other rational conclusion.

The State does not explicitly argue that the admission of the text messages was harmless error, but it does argue that the expert witness testimony of Investigator King was harmless. We disagree.

We question the consistency of the State pleading harmless error in this case when it comes to any evidence, such as Investigator King's testimony, tied to the text messages. During its closing statement at trial, the State called the phone evidence "the State's strongest evidence in this case," suggesting that nothing more was needed to prove the case beyond a reasonable doubt.[27] At least some of the text messages likely would have meant little to the jury without Investigator King's interpretation of the messages. Because Investigator King translated some of the most damning text messages for the jury, the State's case against Appellant was *by its own admission* built on testimony we have found to be impermissible. It is difficult to imagine how the State can call a portion of its presentation "the State's strongest evidence in this case" during trial, then turn around and argue to this court that the admission of a significant portion of that evidence constitutes harmless error. *See State v. Bell*, 430 S.C. 449, 473, 845 S.E.2d 514, 527 ("[B]ecause the State continuously stressed the improper statements in its closing argument, 'it is impossible under these circumstances to conclude the improper evidence did not impact the jury's verdict.'" (quoting *State v. King*, 334 S.C. 504, 515, 514 S.E.2d 578, 584)); *see King*, 334 S.C. at 514–15, 514 S.E.2d at 583–84 ("The improper

---

[27] Among the allusions to the evidence made by the State during its closing arguments: "Let's talk about the phone because *that is the State's strongest evidence in this case* and it will completely destroy the credibility of any defense argument because you take one look at that phone and you know the truth beyond a reasonable doubt." (emphasis added); "You want a gram of clear. *You know from Investigator Harrelson, Investigator King, what clear is*." (emphasis added); "Investigator King told you what a reup is . . . ."; "It just so happens [Appellant] has a bunch of meth text dealing."

evidence suggested to the jury that appellant was guilty of committing the charged crimes because of his criminal propensity to commit crimes and his bad character. The State continuously stressed this improper testimony in its closing argument. Therefore, it is impossible under these circumstances to conclude the improper evidence did not impact the jury's verdict."); *cf. State v. Phillips*, 430 S.C. 319, 342–43, 844 S.E.2d 651, 663 (2020) (ruling, in a case where witness and prosecutor both misportrayed DNA evidence, "[w]e need not determine whether the risk of innocent confusion materialized in this case, however, because the incorrect statements in closing argument all but guaranteed the jury was confused and misled. *If there were any possibility we might find the error of admitting the evidence harmless, the assistant solicitor extinguished that possibility with her incorrect statements in her closing argument*." (emphasis added)).

The State obviously *wanted* Investigator King's interpretation of the text messages to contribute to the verdict. We take the State at its word—as presented at trial—that the messages and their translation by Investigator King did so.

For the same reason, we find that the improper admission of the text messages was not harmless. Having heard testimony about numerous texts suggesting Appellant was involved in drug trafficking, it seems unlikely that the jury could screen out that information and focus solely on whether Appellant was the owner of the methamphetamine at issue in this case.

It is useful to remember what was at the heart of Appellant's trial on the drug trafficking charge in this case: the allegation that Appellant was the owner of the methamphetamine found in the pants. Appellant was not on trial for any of the drug transactions recorded in his text messages.

By the end of the trial, though, Appellant was no longer defending himself merely against the charges in the indictments in this case, but also against the implicit charge that he had previously dealt drugs on multiple occasions. *Lyle*, 125 S.C. at 426, 118 S.E. at 810 ("Admission of the evidence as to the alleged Georgia offenses forced him to undertake in this case the trial of three other cases, not for the purpose of disproving the admitted criminal intent of the act charged, but to rebut the illegitimate inference of his guilt that would be raised by evidence that he had committed or was accused of having committed other similar crimes."). The evidence that Appellant was involved in the methamphetamine trade on previous occasions could be viewed as clear and convincing. But the State did not charge Appellant based on those occasions; it charged Appellant with owning a specific quantity of drugs at a specific place at a specific time. It does not take an imaginative mind to see how even a juror who held a reasonable doubt that the drugs in

Appellant's home were his could be persuaded to convict Appellant nonetheless, or how the evidence in the text messages might have been the final quantum of proof needed to persuade a hesitant juror that the Appellant was indeed the owner of the drugs. *See Lyle*, 125 S.C. at 416, 118 S.E. at 807 ("Proof that a defendant has been guilty of another crime equally heinous prompts to a ready acceptance of and belief in the prosecution's theory that he is guilty of the crime charged. Its effect is to predispose the mind of the juror to believe the prisoner guilty[] and thus effectually to strip him of the presumption of innocence."). *See also King*, 334 S.C. at 514–15, 583–84 ("The improper evidence suggested to the jury that appellant was guilty of committing the charged crimes because of his criminal propensity to commit crimes and his bad character. The State continuously stressed this improper testimony in its closing argument. Therefore, it is impossible under these circumstances to conclude the improper evidence did not impact the jury's verdict.").

We are unable to say, without a reasonable doubt, that the evidence in this case is so strong "that no other rational conclusion can be reached." *Reyes*, 432 S.C. at 406, 853 S.E.2d at 340 (quoting *State v. Collins*, 409 S.C. 524, 538, 763 S.E.2d 22, 29–30 (2014)). It might seem *unlikely* under the facts of this case that the drugs belonged to someone other than Appellant. The State asserted that the methamphetamine belonged to Appellant, he contended that it did not, and the decision of whether the State had proved its version of the narrative beyond a reasonable doubt was one for the jury to make without the impermissible evidence. Given those considerations, neither the admission of Investigator King's testimony nor the admission of the text messages was harmless.

## CONCLUSION

We reverse Appellant's conviction on methamphetamine trafficking and possession of a weapon during the commission of a violent crime; affirm the convictions possession of a handgun by a person convicted of a crime of violence and for possession of a handgun with the serial number obliterated;[28] and remand for a new trial on the reversed convictions.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

---

[28] Appellant does not contest before this court the latter two firearms convictions on any grounds other than the denial of his motion to suppress and, potentially, the jury charge. Because we affirm on those grounds, we do not reverse these convictions.

**HUFF and WILLIAMS, JJ., concur.**